CHASE MANHATTAN BANK, Respondent-Appellant *v.* NISSHO PACIFIC CORPORATION et al., Appellants-Respondents.

First Department, December 15, 1964.

216

*Andrew J. Connick* of counsel (*Samuel R. Ballin* with him on the brief; *Milbank, Tweed, Hadley & McCloy,* attorneys), for respondent-appellant.

*John R. O'Reilly* for Nissho Pacific Corporation, appellant-respondent.

*Morton Zuckerman* of counsel (*Dunn & Zuckerman,* attorneys), for Iino Kaiun Kaisha, appellant-respondent.

STEVENS, J. These are appeals and cross appeals from an order entered February 28, 1964. Plaintiff, the Chase Manhattan Bank (herein Chase) appeals from so much of the order as denied its motion for summary judgment against defendant Iino Kaiun Kaisha, Ltd. (herein Iino), and Iino cross-appeals from that part of the order which denied its motion for summary judgment against Chase and alternatively for judgment over against its codefendant, the Nissho Pacific Corporation (herein Nissho). Nissho cross-appeals from the denial of its motion for summary judgment against Chase and Iino.

Nissho, a domestic corporation and wholly-owned subsidiary of the Nissho Company, Ltd., a Japanese corporation, had a series of transactions with Amkor Corporation (Amkor) prior to 1961 whereby it purchased hog grease from Amkor, also a domestic corporation, for export. Amkor would obtain the grease from domestic producers. As between Amkor and Nissho, it is claimed credit was usually involved in the various transactions. In January, February and March, 1961 Nissho entered into eight contracts with Amkor for a total purchase of inedible tallow from Amkor of 2,185 metric tons f. o. b. named ports or vessels. All but 635 tons were to have been delivered by April, 1961. There is no dispute that Amkor was in default in April on prior monthly deliveries. By a written agreement dated February 28, 1961 Nissho confirmed its purchase from Amkor Corporation of 250 metric tons of inedible choice white

grease at $206 per metric ton f. o. b. vessel S. S. *Muneshima Maru* (a vessel owned by Iino) early or mid-May, 1961 destined for Kobe, Japan, with payment to be made by a letter of credit or cash against documents in San Francisco, at the buyer's option. On March 2, 1961 there was a similar confirmation for 85 metric tons under the same conditions, payment to be made in a similar fashion. Amkor had defaulted in its obligations and Nissho threatened suit for damages. Thereafter, on May 7 and 8, 1961 hog grease was pumped aboard the vessel in Chicago, Illinois. A receipt, dated May 9, 1961, was issued by the chief officer, S. Mitsuda, stating " Received on board said to be 335 m/t of choice waite [sic] grease " which was executed and delivered to an unidentified man. On May 12, 1961, after a bill of lading had been issued which was dated at San Francisco May 8, 1961 and apparently issued on or before May 10, 1961, a second receipt was signed by S. Mitsuda on the letterhead of Iino addressed to Messrs. Swift and Company (Swift) which stated " Received on board ' MUNESHIMA MARU ' from Swift & Company, Chicago, Said to be 327.78 Metric Ton Choice White Greese [sic] * * * for the account of Chase Manhattan Bank." Following therewith appears another date " 5/8/61 ". It is not disputed that the receipt was actually obtained May 12, 1961. The bill of lading to which reference has been made listed the shipper as the Nissho Pacific Corporation, destination Japan and was signed for Iino by its agents, Baake Steamship Corporation by G. Hamilton. The space in the vessel had been booked by Nissho's parent, the Nissho Company, Ltd. in Japan and a written confirmation of the booking made in Japan March 22, 1961.

Amkor, in attempting to obtain the grease, contacted Swift and arranged to purchase the grease from it. May 2, 1961, Swift wrote to several parties, including Iino's agent at Chicago, United States Navigation Company, Inc. (Navigation) concerning the loading of the hog grease. The letter noted " We will require Mate's receipts for both lots." The lots were described as one having been sold to Amkor and the other to another firm not here involved. May 5, 1961 by teletype Amkor advised Nissho that it had sold the grease to Nissho on an f. o. b. vessel basis and that Amkor would not do the forwarding on this transaction, that Swift wanted to know who the forwarder was to process the export declaration. Amkor requested Nissho to attend to the export formalities, stating that Nissho was the shipper. Nissho stated the name of its forwarder, Arthur J. Fritz and Company of San Francisco, California.

After entering the contracts with Nissho for the sale of tallow, and while or prior to negotiating with Swift for the purchase from it of the tallow, Amkor, on April 26, 1961, contacted Chase to obtain financing for the transaction. Amkor had dealt with Chase for several years prior to April 26, 1961 and had obtained various loans and advances from it. On April 26, it requested Chase to finance the sale under the contracts of February 28 and March 2, 1961. Amkor informed Chase that it had made arrangements to purchase the goods from Swift in Chicago. Chase learned or knew as of April 24, 1961 that Amkor was in financial difficulties and Chase asserts that it advised Amkor it would not advance the funds required unless title to the merchandise and the shipping documents were put in its name. Chase asserts that Amkor gave this assurance and that relying thereon it sent a telegram to Swift on April 26, 1961 advising it that it would honor Swift's sight draft for the purchase price of the merchandise if accompanied by specified shipping documents including a signed clean mate's receipt issued in the name of plaintiff. It might be noted no supporting statement of Amkor to that effect is in the record. On May 17 Chase received from Swift a letter dated May 16, 1961 enclosing a sight draft drawn on Amkor in the sum of $67,194.90 to which was attached the receipt dated May 12, 1961 together with other documents. A copy of this communication was sent by Swift to Amkor with two invoices attached. On May 18 Chase wrote to Amkor enclosing the documents received from Swift for the sole purpose of Amkor's inspection. Chase advised Amkor that if the documents were found to be in order to confirm the same in writing and return them immediately and stated '' [u]pon the return of these documents we shall effect payment to Swift and Company debiting an advance account.'' Amkor was also requested in that letter to furnish the additional documentation necessary to make collection from Nissho. From the proceeds of the collection Chase's advance was to be liquidated and any excess credited to Amkor. Amkor replied immediately, delivering the communication to Chase's messenger as requested, stating that the documents were in order and enclosing Amkor's invoices on Nissho '' as well as our draft '' and further requesting Chase to '' be careful to detach the Swift invoices from the documents * * * so that the documents are accompanied by Amkor's invoices, not Swift's.''

The application by Amkor for the advance from Chase, dated May 18, 1961, states: '' [w]e hereby apply this date for an advance of $67,194.90 to be made under our *General Loan and Collateral Agreement on file with you* and agree to repay the

same on DEMAND with interest at the rate of 6 per cent. per annum.'' (Italics supplied.) Apparently attached to such application is a notice to Amkor that the loan is against documents covering 327.78 metric tons white grease on S. S. *Muneshima Maru*, stating '' Please sign and return original of attached loan application '' and a third form notifying Swift that its account had been credited with $67,194.90 '' Proceeds your collection # 1550 dated 5/16/61 sales # 10754.'' Thereafter Chase forwarded to the Federal Reserve Bank at San Francisco Amkor's draft on Nissho accompanied by the May 12 receipt and other shipping documents, as well as Amkor's invoices. Payment was refused by Nissho on the ground Amkor was indebted to Nissho for more than the amount of the draft. May 26, 1961 plaintiff wrote Navigation, Iino's agent, to which Swift had delivered the earlier receipts dated May 9, 1961, enclosing a photocopy of the receipt of May 12, stating it understood the vessel to be bound for Japan with a scheduled stop at Los Angeles, California, that bills of lading had been issued for the merchandise showing Nissho as the shipper and requesting a copy of such bill of lading. It informed Navigation Chase's client had sold the merchandise to Nissho and negotiated the underlying draft and documents with Chase but that Nissho had declined payment of the draft. Chase claimed to be owner of the merchandise as a holder in due course of the draft and documents. Navigation, as agent for Iino, replied by letter dated June 7, 1961, informing Chase that the tallow loaded at Chicago '' was booked by and delivered under the instructions of Nissho '' and upon presentation of bills of lading by Nissho, and, after loading, original bills of lading had been signed and released to Nissho. Navigation declined to give a copy of the bill of lading to Chase.

Thereafter Chase instituted suit against Nissho and Iino. Its complaint contains three causes of action. The first cause is against Nissho only and charges conversion of the goods and seeks money damages; the second, also against Nissho only, charges breach of contract, in that Nissho received the bill of lading of merchandise and became obligated to Chase for $67,522.68 which it has refused to pay; the third cause, against Iino only, charges conversion and seeks money damages. Iino's answer, after pleading denials, and admitting the issuance of a negotiable bill of lading to Nissho on May 8, 1961, contains several affirmative defenses. It pleads that it acted in accordance with the requirement of the applicable statutes of the United States, the '' Carriage of Goods by Sea Act '' (U. S. Code, tit. 46, § 1300 *et seq.*) and title 49 of the United States Code (§ 81 *et seq.*), and with the requirements of the laws and

statutes of Japan, that Chase is estopped by its actions because it knew of Nissho's purchase from Amkor, that the merchandise was to be delivered to Iino's vessel and at no time prior to such delivery or to the delivery of the merchandise at Japan did Chase give or cause to be given notice of its alleged claim or right. Nissho's answer, in addition to denials and admissions, affirmatively pleads that Amkor was in default of deliveries to it, was in serious financial difficulty in March and April, 1961, that Chase knew of Amkor's financial difficulties as well as its default to Nissho when it entered into its arrangements with Amkor but failed to give Nissho any notice of its title, interest or right in the shipment and thereby waived such claim. Nissho also pleads estoppel as to Chase, that Nissho has allowed the value of the merchandise as a setoff against Nissho's claim for damages against Amkor and that the indebtedness of Amkor to Nissho has been agreed and stipulated by Amkor with Nissho and the creditors' committee of Amkor, of which Nissho is a member, in the sum of $74,000, and an order to that effect entered by the Referee in the proceedings for reorganization of Amkor, and there has been credited upon such indebtedness the sum of $67,522.68. Nissho also claims the receipt of May 12 was caused to be issued by Chase without authority. After various proceedings and examinations before trial, each of the parties sought summary judgment, and upon the denial thereof have appealed to this court.

Two things may be noted before further discussion.

Neither Swift nor Amkor, then customers of Chase, have been brought into this action, nor has any testimony been elicited from them. On June 14, 1962, this court affirmed a denial of a motion for summary judgment brought by Nissho against Chase. Since that time there have been extensive examinations of the various parties before trial, and certain matters are now not in dispute.

Chase did not give Iino or Nissho any notice of its alleged interest until some time after the issuance of the on board bill of lading, nor did the draft presented to Nissho for payment reveal any special interest of Chase in the merchandise. Chase was aware as early as April 26, 1961, that Amkor was unable to meet its obligations, and admitted it had to assume there were possibilities of some defaults by Amkor, but did not inquire whether Amkor had defaulted on prior contracts with Nissho. There was no limitation placed by Chase on Amkor's sale to Nissho of this shipment.

Swift, after receiving the advice from Chase, notified Iino through its agent that the merchandise would be delivered to

the ship for Amkor's account. The same letter called for a mate's receipt without any specification as to the name in which it should be issued. Moreover, Swift, through Amkor requested Nissho to obtain the export declaration, and Amkor made it clear to Nissho that Nissho, not Amkor, was the shipper.

The bill of sale, dated May 9, 1961, from Amkor to Nissho for 327.78 metric tons, recites that it is " F. O. B. Muneshima Maru from Chicago May 9th." " The general rule is that upon a sale ' f. o. b. the point of shipment,' title passes from the seller at the moment of delivery to the carrier, and the subject of the sale is thereafter at the buyer's risk ". (*Standard Casing Co.* v. *California Casing Co.,* 233 N. Y. 413, 416; *Disch* v. *National Sur. Co.,* 203 App. Div. 723.) Ordinarily, delivery to the carrier is delivery to the buyer.

The terms for payment appearing in the bill of sale were " net cash on first presentation of accompanying sight draft." The question arises whether setoff is a proper form of payment in light of that provision and the earlier provisions which appeared in the confirmation orders.

In *Foreign Trade Banking Corp.* v. *Gerseta Corp.* (237 N. Y. 265) defendant on October 21, 1919 entered into a contract with Raw Silk Co. to purchase 250 bales of raw silk at an agreed price of $8.65 per pound. Payment was to be by cash or trade acceptances. Raw Silk arranged with plaintiff to finance the deal by a letter of credit and the goods were shipped from China under a bill of lading in plaintiff's name. When the goods arrived they were released by plaintiff to Raw Silk under so-called trust receipts with title to remain in plaintiff. Defendant was entirely unaware of these arrangements. July 29, 1920, Raw Silk sold 20 bales of silk to defendant who receipted therefor as the property of Raw Silk. On the same day plaintiff wrote defendant inclosing trade acceptances, invoices, etc. Defendant refused to pay, claiming a right of setoff on certain claims against Raw Silk though such claims had not matured at the time the silk was actually delivered but had matured when the action was begun. Defendant asserted it dealt with Raw Silk as principal. From a judgment on a directed verdict in favor of plaintiff, defendant appealed. In reversing and directing a new trial, the court pointed out " [i]f the agent sells goods in his own name, having possession of the goods, the right of setoff which might be asserted against the agent may be asserted against the undisclosed principal " (p. 271). And this is so even though the sale is " a cash sale and the purchaser, when he obtained the goods, did not intend

to abide by his contract but proposed to set off a demand against the agent'' maturing after the delivery of the goods which existed prior to such delivery (*ibid.*, p. 273, citing also *Hogan* v. *Shorb*, 24 Wend. 458, 464). There, as here, the seller was vested with every indicia of title, and the buyer at the time of sale had no notice of any adverse claim of title. (Cf. *Jewell Elec. Instrument Co.* v. *National City Bank of N. Y.*, 219 App. Div. 272.) So far as Nissho knew at the time of the setoff Amkor was still a going business. The right of setoff existed and would not be defeated if Amkor had been insolvent in fact, though not judicially declared, even if Nissho's claim had not matured (cf. *Gerseta Corp.* v. *Equitable Trust Co.*, 241 N. Y. 418).

Under chapter 28 of title 46, '' Carriage of Goods by Sea Act'' of the United States Code (§ 1300 *et seq.*, eff. April 16, 1936), and more particularly section 1303, after receiving goods into his charge the carrier '' shall, on demand of the shipper, issue to the shipper a bill of lading '', etc. (subd. [3]). It is expressly provided that nothing in chapter 28 '' shall be construed as repealing or limiting the application of any part of sections 81–124 of Title 49 '' (subd. [4]). Under the sections referred to bills of lading are governed by their provisions. An order bill is negotiable (U. S. Code, tit. 49, § 83) and a carrier is justified in delivering the goods to one lawfully entitled thereto (*ibid.*, § 89). Chase urges that these goods were wrongfully delivered by Iino, that section 90 of title 49 applies, and Iino is liable to Chase.

Section 90 provides, in part: '' [w]here a carrier delivers goods to one who is not lawfully entitled to the possession of them, the carrier shall be liable to anyone having a right of property or possession in the goods if he delivered the goods otherwise than as authorized by subdivisions (b) and (c) of section 89 of this title ''. The subdivisions referred to justify a carrier in delivering such goods to '' (b) The consignee named in a straight bill for the goods, or (c) A person in possession of an order bill for the goods, by the terms of which the goods are deliverable to his order; or which has been indorsed to him, or in blank by the consignee, or by the mediate or immediate indorsee of the consignee.'' Here the bill of lading was in proper form and delivery as made would be warranted unless other limitations apply.

Section 90 further declares, though the carrier deliver goods as above authorized, he shall be liable if prior thereto he '' (a) [h]ad been requested, by or on behalf of a person having a right of property or possession in the goods, not to make such

delivery, or (b) [h]ad information at the time of the delivery that it was to a person not lawfully entitled to the possession of the goods." These provisions are applicable only if Chase had title to and right of possession of the goods. Certainly an unpaid seller may reserve a right of possession or property, or a security interest when goods are shipped (Personal Property Law, § 101; Uniform Commercial Code, § 2–401). Can Chase be fairly considered to be or stand in the role of an unpaid seller, or one who had a paramount right or title to the goods?

Nissho & Co., Ltd., the parent company of Nissho, by its fixture note, dated March 22, 1961, had reserved space on the *Muneshima Maru* for the shipment of hog grease. For all practical purposes in the context of this operation, and in light of the general course of dealings between Amkor and Nissho, and Nissho and Nissho & Co., Ltd., Nissho and its parent corporation may be considered as one to the extent that Nissho did not usurp its authority or wrongfully pre-empt the space reserved.

Amkor received title to the merchandise from Swift and intended to, and did, pass title to Nissho. Nowhere in the record before us does it appear that Amkor claims a reservation of title or a security interest. Chase clearly knew, by its own admission, of Amkor's financial difficulties at least as early as April 23, 1961, including the possibilities of defaults by Amkor, yet beyond its direction to Swift apparently it did nothing. Certainly it did not advise Nissho or Iino of its claimed interest prior to the issuance of the bill of lading. The initial mate's receipt bore no indication of Chase's interest, and the mate's receipt of May 12, 1961, was presented by someone to the mate for signature after the vessel left Chicago and while in transit. It is that receipt upon which Chase necessarily places great reliance. Presumably this document was obtained by or in behalf of Swift, because a reference appears thereto in its letter of May 16, 1961 to Chase.

Swift, however, by its letter of May 2, 1961, notified Navigation, Iino's agent, that it sold 335 metric tons for the account of Amkor to be delivered to *Muneshima Maru,* and its bill of sale dated May 9, 1961, reflects such sale to Amkor. Thus, Swift had no further interest in or authority over the goods. Meanwhile, on May 5, 1961, Amkor in its teletype conversation with Nissho had re-emphasized its sale of the grease to Nissho, that Amkor would not do the forwarding or shipping and informed Nissho that Swift wanted the name of Nissho's forwarder. Obviously Swift and Amkor intended to part with

both title and possession and did so. The burden was placed on Nissho to obtain the export declaration and other necessary documents as shipper of the goods on this f. o. b. delivery. There is nothing to indicate that either of these defendants acted wrongfully or fraudulently in obtaining title or possession of the merchandise.

It must be noted that under the Carriage of Goods by Sea Act, a bill of lading is to be issued only on demand of the shipper (U. S. Code, tit. 46, § 1303; Poor, Charter Parties, § 64). A bill of lading "serves three distinct purposes in connection with the carriage of goods (a) as a receipt for the goods, (b) as representing the contract of carriage, (c) as a document of title, that is, taking the place of the goods themselves for the purpose of sale, pledge, etc." (Poor, Charter Parties, § 59; 13 C. J. S., Carriers, § 122 et seq.).

Generally, a receipt merely acknowledging the delivery of goods is not a contract at all, it is merely preliminary to a bill of lading unless the parties so intend (*Luckenbach S. S. Co.* v. *American Mills Co.*, 24 F. 2d. 705; cf. *R. L. Rothstein Corp.* v. *Kerr S. S. Co.*, 21 A D 2d 463) in which case the law fixes the rights and liabilities of the parties (see 13 C. J. S., Carriers, § 121 et seq.). But where a receipt is delivered after shipment under a prior contract, it will not supersede the agreement under which the shipment was made (*ibid.*; cf. *R. L. Rothstein Corp.* v. *Kerr S. S. Co.*, *supra*). Bad faith or negligence cannot be charged to these defendants who were unaware of Chase's interest. *Farmers & Mechanics' Nat. Bank* v. *Logan* (74 N. Y. 568) cited by Chase, is not applicable. In that case not only was the bill of lading issued to plaintiff but other documents as well. Plaintiff placed restrictive notations on the bill of lading. When the defendants purchased the wheat from one Brown they did not ask for any evidence of title. Had they done so they would have learned of the restrictions. Under the facts of the case there was no general ownership in Brown and defendants were charged with constructive notice of the contents of the bill. In this case there was full ownership — first in Swift, then in Amkor, and duly transferred to Nissho. Other cases cited may also be distinguished. Chase by its own inaction as to Iino and Nissho permitted the present situation to develop. Nor did Chase actually advance any money until May 18, 1961, eight days after the issuance of the bill of lading and almost 10 days after the issuance of the initial mate's receipt. When the bill of lading was issued Chase had at most a contemplated future interest, conditioned upon a loan which it could refuse to make,

especially in light of its knowledge of Amkor's precarious financial situation. Even Chase's letter of May 26, 1961 to Navigation states in part " [a] client of ours sold this merchandise to Nissho ", thus recognizing that a sale actually occurred. Nor did the second mate's receipt of May 12, 1961, actually contain any express limitation. Chase has failed to establish that it had title or a right to possession of the goods and that the bill of lading and other shipping documents were wrongfully issued.

Accordingly, the order appealed from should be reversed, on the law, the complaint dismissed, and summary judgment granted the defendants, with costs.

BREITEL, J. P., RABIN, McNALLY and STEUER, JJ., concur.

Order, entered on February 28, 1964, unanimously reversed, on the law, with $30 costs and disbursements to defendants-appellants-respondents, the complaint dismissed and summary judgment granted to the defendants.