**Daniel HUBBARD, Plaintiff,**

v.

**UTZ QUALITY FOODS, INC., Defendant.**

**UTZ QUALITY FOODS, INC., Counter–Claimant,**

v.

**Daniel HUBBARD, Counter–Defendant.**

No. 93–CV–6153L.

United States District Court, W.D. New York.

Oct. 19, 1995.

David A. Shults, Shults & Shults, Hornell, NY, for plaintiff.

Edward J. Degnan, Mendon, NY, for defendant.

### TRIAL DECISION AND ORDER

LARIMER, District Judge.

This is a breach-of-contract action brought by Daniel Hubbard ("Hubbard") against UTZ Quality Foods, Inc. ("UTZ"). Hubbard is a Bath, New York potato farmer and UTZ is a Pennsylvania corporation that purchases potatoes for processing into potato chips.

On April 20, 1992, Hubbard executed a written contract to supply UTZ with a quantity of potatoes. The contract, a two-page, form-contract prepared by UTZ, required that the potatoes comply with certain quality standards. Hubbard claims that he was ready and able to deliver the required shipments of potatoes but that UTZ wrongfully and without basis rejected his potatoes. Hubbard contends that the sample potatoes provided to UTZ complied with all the quality requirements and, therefore, he complied with all terms of the contract. Hubbard claims that UTZ breached the contract and claims damages for the full contract price, $68,750.

UTZ denies Hubbard's allegations. UTZ contends that the potatoes supplied by Hubbard did not meet the quality requirements of the contract and, therefore, they were

properly rejected. UTZ filed a counterclaim against Hubbard contending that he breached the contract by failing to provide the potatoes required by contract.

The case was tried to the Court for 5 days. The Court took testimony from 13 witnesses and received numerous documents and deposition testimony in evidence. This decision constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## FACTS

### April 20, 1992 Potato Contract.

On April 20, 1992, Hubbard signed the two-page contract prepared by UTZ for farmers who produced potatoes for UTZ. UTZ is a large food processor in Hanover, Pennsylvania whose principal products are potato chips and other snack foods. The contract required Hubbard, beginning "approximately September 5, 1992" to ship 11,-000 hundred-weight of Norwis (657) new chipping potatoes. Hubbard was to ship 2,000 to 4,000 hundred-weight per week with schedules to be arranged with UTZ. The price was $6.25 per hundred-weight, F.O.B. New York.

The contract provided that the potatoes must meet certain quality standards. The buyer, UTZ, was entitled to reject the potatoes if they failed to do so. The potatoes had to meet United States Department of Agriculture ("USDA") standards for No. 1 white chipping potatoes. They had to have a minimum size and be free from bruising, rotting and odors which made them inappropriate for use in the processing of potato chips.

The principal standard at issue in this lawsuit is the color standard. UTZ did not want dark potato chips but white or light ones and, therefore, the potatoes had to be the whitest or lightest possible color. The specific paragraph in the contract relating to color reads as follows:

"Color" shall be at least # 1 or # 2 on the 1978 Snack Food Association "Fry Color Chart."

The Fry Color Chart is a color chart prepared by the Potato Chip/Snack Food Association which has five color designations. Color designation No. 1 is the best or lightest

and the chart contains a visual depiction of potato chips with that color. The last color designation, No. 5, is the darkest reading. The contract required that the chips produced from Hubbard's potatoes must at least meet the No. 2 color designation.

### Claims of the Parties.

In a nutshell, this lawsuit revolves around the color of the potato chips processed from potatoes submitted by Hubbard to UTZ. UTZ rejected all of the submitted potatoes claiming that they did not meet the required "color" standard. UTZ claims that the samples were too dark and did not meet UTZ' standards for producing white or light chips. Hubbard, on the other hand, contends that UTZ was arbitrary in its refusal to accept his potatoes and that his potatoes substantially complied with the color requirement. Hubbard contends in his pleadings that UTZ' rejection was motivated by concerns about price, not by quality. Hubbard alleges that after rejecting his potatoes, UTZ obtained similar potatoes from other sources at prices below his contract price.

The ultimate factual issue in this case is whether the potato chips made from Hubbard's potatoes failed to meet the color specifications of the contract. In other words, was UTZ' rejection of the installments proper.

In large part, this case turns on matters of law relating to the rights of a buyer, such as UTZ, to reject a seller's goods that are deemed to be non-conforming. The facts and the rights and obligations of the parties must be analyzed pursuant to the New York Uniform Commercial Code ("UCC").

Before discussing the principal issue, whether UTZ wrongfully rejected Hubbard's potatoes, I will deal with several other issues raised by the parties at trial. Some are material, some are not. Based on the evidence and the reasonable inferences from that evidence, I find the following facts.

### Rejection of Hubbard's Potatoes.

Hubbard contends that he sent several sample loads of potatoes to UTZ for inspection. On or about September 22, 1992, he sent 1,000 pounds of potatoes from one of his

fields to UTZ for testing. These were rejected. Hubbard thought that they looked good when he harvested them but UTZ reported that when they were processed the color was poor. Hubbard discussed this rejection with Richard P. Smith, UTZ' Potato Manager, who told Hubbard to keep sending samples.

Thereafter, on October 1, 1992, Hubbard sent an entire truck load of potatoes to UTZ for processing under the contract. This installment consisted of 425–450 one-hundred-pound bags. Hubbard did not accompany this shipment to Pennsylvania but he was advised by telephone that none of the potatoes would be accepted due to their poor color.

Hubbard requested that UTZ put the reasons for this rejection in writing and Smith did so in a letter dated October 1, 1992 (Ex. 404).

Smith stated in that letter that the load had been rejected because the color (a No. 3 color designation) was unacceptable under the contract. Smith attached a photograph of the potato chips which had been processed and he returned a sample bag of those processed chips.

Smith told Hubbard that he did not intend to cancel the entire contract but told Smith that more tests should be run on Hubbard's other fields to see if the contract could be filled with crop from those fields.

About a week later, on October 7, Hubbard and his brother prepared a 1,000 pound load of potatoes and drove it to UTZ' facility in Pennsylvania to see if the potatoes would pass muster. Hubbard watched the chips go through UTZ' lines, and he made a video tape of some of the process. On that tape, Hubbard is heard to say that when he saw the chips being processed, they looked "better" than he thought they would. Once again, the chips were rejected, this time by an UTZ employee Kim R. DeGroft. DeGroft had been employed by UTZ for 16 years and in 1991 he was a "lead" person or supervisor in the Potato Department. He recalled that when these chips were processed, Hubbard commented that they should have been sold to Wise, a company that routinely accepted darker chips for processing. DeGroft testified that he had been inspecting potatoes for 5–6 years, and he believed Hubbard's lot was in the No. 3 color range.

Hubbard testified that he became quite upset at this rejection, because he believed that the chips looked good enough to meet the No. 1 or No. 2 color designation. He insisted that UTZ perform an Agtron instrument reading on the chips. Although he was not allowed to witness the test, it was reported to Hubbard that the Agtron reading was 54.2, which was in the No. 3 color category, but just below the 55 designation which would have qualified as a No. 2 designation.

After Hubbard returned from Pennsylvania, on October 8, 1992, he had a telephone conversation with Smith during which Smith told him that based on the samples, it did not appear that Hubbard's potatoes "would work" because they did not meet the contract specifications. Smith, however, told Hubbard that he could send additional samples and shipments to Pennsylvania for inspection. Smith, however, refused to arrange for the transportation but directed Hubbard to do so. Hubbard refused saying that was not the "custom" and that in the past UTZ had always sent trucks to the fields for delivery of the product. There was apparently some dispute between Smith and Hubbard as to whether Hubbard was in default on charges to certain trucking companies for other, unrelated shipments.

After October 7, Hubbard never delivered, or caused to be delivered, any other shipments of potatoes for UTZ pursuant to the contract.

After allegedly conversing with certain government officials, Hubbard advised UTZ by telegram that he intended to sell his potatoes on the open market and charge UTZ for the difference in price.

### Source of Potatoes.

It is not disputed that Hubbard had the capacity to provide the requisite number and quantity of potatoes to UTZ as required by the contract. The crucial issue was the quality of those potatoes.

UTZ contended at trial that it was unaware that some of the potatoes came from

fields owned by Hubbard's father and not from Hubbard. In other words, UTZ suggested that it was relieved under the contract because Hubbard supplied different potatoes from those that he had pledged.

I find as a fact that the origin of the potatoes was not critical for purposes of this contract. I accept and find as fact that both Hubbard and his father had supplied potatoes to UTZ in the past and on at least one occasion they had jointly contributed potatoes to a single load.

On August 24, 1992, Hubbard had shown Richard Smith, UTZ' potato manager, the location of the fields from which the potatoes were to be harvested.[1] I accept Hubbard's testimony that the loads sent to UTZ for testing came from those fields. But whether the potatoes were from those fields or not as largely immaterial. The contract did not specify where the potatoes were to be grown and harvested. The specifications in the contract had nothing to do with the potatoes' origin. I find as a fact that the origin of the potatoes was of little consequence to UTZ. Had the potatoes met the quality specifications, UTZ would have accepted them regardless of their source.

### Inclement Weather.

I also find as a fact that the weather during the summer of 1992 was very bad for potato farming.

Virtually every witness at trial who was involved in farming or processing potatoes in 1992 testified that it was a cold, rainy growing season which had a negative impact on the potato crop. It appears that the rain produced an ample crop but the cool weather prevented the crop from maturing properly and, therefore, the entire crop that season was immature and very poor. To the extent that there was disagreement on this issue, I accept and find as fact that the poor weather adversely affected the potato crop in New York during the summer of 1992. I find as fact that the entire potato industry suffered that season because of the weather and that other farmers had their potatoes rejected by UTZ for the same reasons that Hubbard's potatoes were rejected.

### Visual Inspection/Agtron Reading.

UTZ employees Smith and DeGroft relied on their visual inspection of the processed potato chips when they rejected them. Hubbard contends that this rejection was arbitrary and unreasonable. He advances two interrelated arguments on this point. First, he contends that he took samples of the rejected chips and had them analyzed for color at two separate locations. Both tests determined that the samples for the most part exceeded the No. 3 color designation on the Fry Color Chart. This testing was done not by visual inspection but by use of an Agtron instrument. He claims that these tests demonstrate that his potatoes in fact met the contract specifications for color.

Second, Hubbard suggests that UTZ' rejection was wrongful because it used visual inspection and not the Agtron instrument to determine color.

An Agtron machine is a photo electric instrument that measures reflectants of light on a surface. The higher the Agtron reading, the greater the reflectants and, therefore, the lighter or brighter the item that is being measured. The Fry Color Chart contains comparable Agtron readings for each of the five color designations. For example, color designation No. 1 on the Fry Color Chart equates to an Agtron reading of 65 or higher; a color designation No. 2 equates to an Agtron reading of 55 to 64.

Hubbard contends that UTZ should have based its inspection on Agtron readings and not on the visual inspection of its employees.

Several points must be made concerning the Agtron testing issue. First of all, the contract between the parties does not specify how the chips are to be tested, visually or by machine. The contract simply requires that the chips must exceed the No. 3 color designation.

I recognize that the contract was a "form" contract prepared by UTZ but, nevertheless, there was no evidence to suggest that either Hubbard or UTZ were unable to require that

---

1. On this trip, Smith collected a small sample of immature potatoes, which he took back to Pennsylvania for sucrose-glucose testing and processing.

the color test be done in a certain fashion. The manner of testing was not specified.

Hubbard testified that he submitted samples from the rejected shipments for testing and that Agtron readings on those samples were, for the most part, within the required range. Sample A and B were part of the October 7 shipment. Sample C was part of the August 24 sample (collected by Smith during his visit to Hubbard) and Sample D was part of the October 1 shipment.

These samples were analyzed first by Dr. Robert Plaisted and Kenneth Paddock at Cornell University in January 1993. They determined that Sample A and a reading of 60/60; Sample B was 59/53; Sample C was 62/64; and Sample D was 54/51.

Even by this analysis Sample D with an Agtron reading of 54/51 did not meet the contract specifications which required at least a No. 2 color designation, which was at least a 55 Agtron reading. Similarly, Sample B with an Agtron reading of 59/53 was borderline, since it overlapped designations 2 and 3.

Another expert, Dr. Wilbur Gould, performed Agtron tests during the summer of 1993, and he found that all of the samples exceeded 60 which placed them in the No. 2 color category. These reports show that, assuming that the same sample was tested by Gould and by Cornell's experts, there is variation even when using the Agtron device. And, as mentioned, at least some of the Agtron readings support UTZ' decision to reject the potatoes.

But aside from these internal inconsistencies, I am concerned about the reliability of the samples used in the testing. There was very little control over the samples from the time they were turned back to Hubbard until they were tested, several months later. Portions of the samples were consumed by Hubbard and his family and the rest were stored in Hubbard's parents home but with very little security or supervision. There was confusion, even at trial, as to how the samples were preserved, maintained and delivered for later testing.

Therefore, I am not able to place much weight on either of these tests because of the confusion surrounding the maintenance and preservation of the samples returned to Hubbard by UTZ.

Concerning testing, the primary issue is whether UTZ was *required* to use Agtron readings and whether its rejection based on visual inspection was unreasonable. In other words, was it unreasonable for UTZ to visually inspect Hubbard's potatoes when more sophisticated machinery was allegedly available?

I find as a fact that under all the circumstances that existed in the fall of 1992, it was reasonable for UTZ to rely on visual inspection when it determined whether Hubbard's installments complied with the contract.

As mentioned, the contract did not require Agtron readings. Therefore, the contract did not prevent UTZ from using visual inspections. Second, the testimony was uncontradicted that those in the industry consistently used visual inspections when grading potatoes under contracts of this nature. Even at the trial, almost three years after the events at issue, visual inspection is still the norm. Hubbard's expert, Wilbur Gould, testified that in his view the Agtron machine was the preferred method for testing, but he conceded that visual inspection is used in the industry. Some processors did not wish to incur the $20,000 cost of obtaining an Agtron machine and so visual inspections persist.

Furthermore, both Smith, UTZ' Potato Manager, and Jack Corriere, UTZ' General Manager, testified that the first Agtron machine obtained by UTZ was in October 1992, and that it was not properly calibrated and used until late October 1992, well after Hubbard's potatoes had been rejected. Both Smith and Corriere testified that visual inspection of chips was the standard in the industry at the time Hubbard presented his potatoes for inspection. Hubbard presented no evidence to contradict that testimony. Smith testified that he had been potato manager for UTZ for over 30 years and during that time he relied on visual inspection and his expertise to determine whether to accept or reject loads.

I credit the testimony, and I find as a fact, that in September and October 1992, visual

inspection of potatoes was the standard used in the industry. I also find that plaintiff understood that his crop would be judged by the visual observations of UTZ' inspectors at the plant, since that was the standard procedure that had been used prior to 1992 when Hubbard and his father had sent potatoes to UTZ for processing.

### Motivation of UTZ.

Hubbard has also failed to convince me, by a preponderance of the evidence, that UTZ benefited by its rejection of Hubbard's potatoes. Smith and Corriere testified that they had suffered significant losses in the past when their potatoes had turned bad in storage. In 1992, UTZ took steps to see that such a disaster did not reoccur and so they were careful in their decisions to accept or reject potatoes.

Furthermore, there is no compelling evidence that UTZ purchased potatoes at lower market prices after it rejected Hubbard's crop. On the contrary, the evidence (Ex. 39) suggests that the market price during late 1992 and early 1993 was equal to or higher than Hubbard's contract price. Hubbard has failed to convince me that UTZ' motivation for rejecting his potatoes was to obtain similar potatoes but at a reduced cost. Therefore, I find as a fact, that UTZ' reason and motivation for rejection was its belief that the potatoes failed to meet the quality standards in the contract.

### DISCUSSION

### UTZ' Rejection of Hubbard's Potatoes.

The primary legal issue in this matter is whether UTZ' rejection of Hubbard's potatoes was proper or wrongful. It is clear that the transaction at issue is a sale of goods governed by the New York Uniform Commercial Code ("UCC") Article 2. Indeed, the parties have stipulated that both Hubbard and UTZ are "merchants" as defined by UCC § 2-104(3).

■ It is also clear that the contract between the parties is an "installment contract" as that term is defined in UCC § 2-612(1): it contemplates "delivery of goods in separate lots to be separately accepted." That the contract is an installment contract does not appear to have been disputed by the parties. However, it is also evident as a matter of law from terms found throughout the contract.

For instance, in paragraph 1, the contract calls for the sale of "11,000 hundred weight of new chipping potatoes ..." to be shipped in quantities of "2,000 to 4,000 hundred weight per week" starting around September 5, 1992. This language clearly contemplates between 3 and 6 total shipments.

Additionally, paragraphs 3(a) and 3(b) specifically note that standards must be met by "all shipments," which suggests that more than one shipment is contemplated.

Finally, paragraph 4, concerning payment, states that "[b]uyer agrees to pay for all potatoes accepted within 30 days of acceptance...." This language suggests paying per shipment, since each shipment is separately subject to inspection (and acceptance), as indicated by paragraph 3. Clearly this is an "installment" contract as defined in UCC § 2-612(1).

As an installment contract, the question of whether UTZ' rejection was wrongful or proper is governed by UCC § 2-612(2) and (3). UCC § 2-612(2) states that a "buyer may reject any installment which is nonconforming if the non-conformity substantially impairs the value of that installment and cannot be cured...." UCC § 2-612(3) states that "whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole."

■ The purpose of this "substantial impairment" requirement is "to preclude a party from canceling a contract for trivial defects." Emanuel Law Outlines, Inc. v. Multi-State Legal Studies, 1995 WL 519999, *7, No. 93 Civ. 7212 (S.D.N.Y.1995). In this case, UTZ rejected Hubbard's potatoes based upon their failure to satisfy the color standard set forth in paragraph 3(c) of the contract. Thus, the issue for me to decide is whether the failure of Hubbard's potatoes to meet the required # 1 or # 2 color minimum

constitutes a "substantial impairment" of the installments.[2]

■ Whether goods conform to contract terms is a question of fact. *See Emanuel Law Outlines, Inc., supra,* at *6 (*citing Interoil v. Apex Oil Co.,* 604 F.Supp. 978, 981 (S.D.N.Y.1985)); *see also, Processed Minerals v. AMF Tuboscope,* 123 A.D.2d 511, 507 N.Y.S.2d 102 (4th Dep't 1986). Moreover, in determining whether goods conform to contract terms, a buyer is bound by the "good faith" requirements set forth in N.Y.U.C.C. § 1–203—"Every ... duty within this Act imposes an obligation of good faith in its enforcement or performance." Thus, UTZ' determination that Hubbard's potatoes failed to satisfy the contract terms must have been fairly reached.

The UTZ–Hubbard contract contains many specific requirements regarding the quality of the potatoes. In paragraph 1 the contract states that "only specified varieties as stated in contract will be accepted...." Paragraph 3(a) states that

> All shipments shall meet the United States Standards For Grades of Potatoes for Chipping, USDA, January 1978 ..., in addition to other provisions enumerated in this 'Section 3'. Loads that do not meet these standards may be subject to rejection.... (emphasis added)

Paragraph 3(b) sets forth specific size requirements (85% or better ... graded to a 1⅞" minimum size); paragraph 3(c) sets forth specific gravity requirements (at least 1.070 in a standard eight pound test); paragraph 3(d) contains the color requirements at issue in this case; and paragraph 3(f) sets forth a number of other defects or incidents of improper treatment or handling of the potatoes that provide UTZ with the right to reject the potatoes.

Clearly, the quality standards are of great importance to UTZ. They are the most detailed aspect of the contract—far more so than timing or even quantity specifications.

■ In a contract of this type, where the quality standards are set forth with great specificity, the failure to satisfy one of the specifically enumerated standards is a "substantial impairment." UTZ obviously cares the most about the specific quality specifications, as is evident from the numerous references throughout the contract.

■ Additionally, I find that UTZ' determination that the potatoes did not meet the required #2 color standard was made in good faith, as required by UCC § 1–203. As noted above, the manner of visual testing utilized by UTZ was reasonable and customary. Further, Smith and DeGroft, the UTZ testers who rejected Hubbard's potatoes, provided credible testimony about their respective experience (Smith—30 years, DeGroft—5–6 years) and method of making such determinations. Accordingly, I find that UTZ fairly and in good faith determined that Hubbard's potatoes were nonconforming.

■ Thus, I find that Hubbard's failure to meet the proper color standard amounted to a "substantial impairment" of the installments (§ 2–612(2)), substantially impairing the whole contract (§ 2–612(3)). Accordingly, I find that UTZ' rejection of Hubbard's potatoes was proper.[3]

### UTZ' Refusal to Transport.

■ Finally, Hubbard asserts that UTZ failed to perform as required when, after October 8, 1992, UTZ refused to send trucks to New York to pick up and transport Hubbard's potatoes to Pennsylvania. The contract does not require that UTZ arrange and

---

**2.** There is no dispute that UTZ' rejection was timely and effective, as required by UCC § 2–602. I find as a fact that UTZ promptly notified Hubbard of its rejection.

**3.** This is not a case where UTZ has rejected the potatoes because they were a week (or a month late) or where the quantities were lower than anticipated. Such nonconformity would not constitute "substantial impairment" of this contract because timing and quantity are not its critical components. *See, e.g., Emanuel, supra,* (delay in installment shipment of bar review study aids not significant where shipment was still timely for the purposes of the contract); *Hudson Feather & Down Products, Inc. v. Lancer Clothing Corp.,* 128 A.D.2d 674, 513 N.Y.S.2d 173 (2d Dep't 1987) (delay in installment payment did not substantially impair value of whole contract).

pay for transportation. In fact, the contract terms expressly state that the "Seller shall ship...." (Contract paragraph 1.)

However, it is not disputed that the usual practice was for UTZ to send its trucks to New York to pick up Hubbard's potatoes. According to the parties' testimony, this was because if the potatoes were accepted, UTZ was responsible for the transportation charges. However, if the potatoes were rejected, Hubbard was responsible for those expenses.

Although the parties' practice is not disputed, the absence of an express contractual requirement limits Hubbard's ability to claim UTZ' refusal to transport after September 8th constituted a breach. Indeed, in light of the fact that the last four shipments had been rejected (thus becoming Hubbard's financial responsibility), it was not unreasonable for UTZ to require Hubbard to pay for future transportation charges "up front." In the event the future shipments were accepted, Hubbard would have had a right of reimbursement from UTZ (subject to any set-off arising from moneys owed by Hubbard for the transportation costs incurred by UTZ for the previously rejected shipments).

Hubbard's responsibility for the transportation of his potatoes is further supported by UCC § 2–504. That provision states in relevant part that:

> Where the seller is required ... to send the goods to the buyer and the contract does not require him to deliver them at a particular destination, then, unless otherwise agreed, he must (a) put the goods in the possession of such a carrier and make such a contract for their transportation as may be reasonable having regard to the nature of the goods and other circumstances of the case....

Because the parties' contract states that the "seller shall ship," this provision applies and compels Hubbard to be responsible for the transportation of his potatoes.

Accordingly, I find that UTZ' refusal to send trucks to New York was not a breach of the parties' contract. I find that it was Hubbard's contractual and statutory responsibility to arrange and pay for transportation. UTZ' failure to assist does not breach the contract.[4]

### CONCLUSION

I find that plaintiff has failed to establish the claims set forth in his complaint by a preponderance of the evidence and, therefore, I find in favor of defendant on plaintiff's claims. Plaintiff's complaint is dismissed and judgment shall be entered accordingly in favor of defendant.

Defendant has failed to prove its counterclaims against plaintiff, and they are all dismissed.

IT IS SO ORDERED.

---

4. This conclusion is further supported by the contract term "FOB New York" (paragraph 2). This term requires Hubbard, as seller, to "bear the expense and risk of putting [the goods] into the possession of the carrier." UCC § 2–319(1)(a). After doing so, risk of loss then is shifted to the buyer. *See Chase Manhattan Bank v. Nissho Pacific Corp.,* 22 A.D.2d 215, 254 N.Y.S.2d 571 (1964), *aff'd,* 16 N.Y.2d 999, 265 N.Y.S.2d 660, 212 N.E.2d 897 (1965). Nothing in the FOB terms, however, requires the buyer (UTZ) to arrange for the transportation.