124 F.3d 132
 1997 A.M.C. 2705
 J.C.B. SALES LTD., Plaintiff-Appellee,
Caterpillar, Inc. and Land Rover Exports, Ltd., Consolidated
Plaintiffs-Appellees,
v.
WALLENIUS LINES (WALLENIUS LINES NORTH AMERICA INC.,) In
Personam, Defendant-Cross-Claimant-Appellant,
M/V Seijin, her engines, boilers, etc., in rem,
Defendant-Third-Party-Plaintiff-Appellant,
San Clemente Shipping S.A., Defendant-Claimant-Cross Defendant.
 Nos. 692, 693, Dockets 96-7621, 96-7661.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 24, 1997.
Decided Aug. 21, 1997.
 
 Alan S. Loesberg, New York City (Caspar F. Ewig, T.E. Willoughby, Hill Rivkins Loesberg O'Brien Mulroy & Hayden, New York City, James D. Skeen, Wright, Constable & Skeen, Baltimore, MD, of counsel), for Plaintiffs-Appellees.
 Christopher H. Mansuy, New York City (William E. Lakis, Walker & Corsa, New York City, of counsel), for Defendant-Third-Party-Plaintiff-Appellant M/V Seijin.
 Joseph F. De May, Jr., New York City (Paul M. Keane, Cichanowicz Callan & Keane, New York City, of counsel), for Defendant-Cross-Claimant-Appellant Wallenius Lines.
 Before: VAN GRAAFEILAND, MESKILL and KEARSE, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 M/V Seijin, in rem, and Wallenius Lines (Wallenius Lines North America, Inc.), the vessel's charterer, appeal from judgments of the United States District Court for the Southern District of New York (Pollack, J.) awarding damages to J.C.B. Sales Ltd., a British corporation, and Caterpillar, Inc., an Illinois corporation, for damage to machinery and equipment sustained during a voyage from Antwerp, Belgium and Southampton, England to Baltimore, Maryland. A third appellee, Land Rover Exports, Ltd., compromised its claim after the appeals against it were filed and is no longer a party. Liability has been stipulated. The only issue is the amount of the awards.
 
 
 2
 On February 28, 1995, Caterpillar delivered fifteen items of construction equipment to the M/V Seijin at Antwerp for carriage to Baltimore. The carrier, Wallenius, gave Caterpillar a Datafreight Receipt ("DFR"), which is prominently marked as non-negotiable and states that it:
 
 
 3
 is not a document of title to the goods [but] is deemed to be a contract of carriage which is subject to the exceptions, limitations, conditions and liberties ... set out in the Carrier's standard Terms and Conditions applicable to the voyage covered by this Datafreight Receipt and operative on its date of issue. Every reference in the Carrier's Standard Conditions of Carriage to the words "Bill of Lading" shall be read and construed as a reference to the words "Non-Negotiable Datafreight Receipt" and the terms and conditions thereof shall be read and construed accordingly.
 
 
 4
 Among the excerpts from the carrier's standard terms and conditions of carriage reproduced on the DFR is the following:
 
 RESPONSIBILITY
 11. Clause Paramount
 
 5
 (1) .... During any periods of carriage by water under this [DFR] the carriage shall be subject at all such times to
 
 
 6
 (a) The Hague Rules (meaning the provisions of the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924) as enacted in the country of shipment, or if no such enactment is in force, as enacted in the country of destination, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the U.S. Carriage of Goods by Sea Act ... shall be considered incorporated herein as if set forth at length; or(b) The Hague Visby Rules (meaning the Hague Rules as amended by the Protocol signed at Brussels on 23rd February 1968) in courts where they apply compulsorily.
 
 
 7
 After taking on Caterpillar's cargo, the M/V Seijin journeyed to Southampton where Wallenius and Caterpillar contracted to ship twenty-four additional items of construction equipment to Baltimore. Wallenius issued a second DFR, the terms of which are substantially the same as those of the Antwerp DFR. The Southampton DFR also states that it is non-negotiable and incorporates the "Carrier's Standard Conditions of Carriage applicable to the voyage," but recites from those standard conditions the following clause:
 
 
 8
 2. responsibility.
 
 
 9
 The Hague Rules contained in the international convention for the unification of certain rules relating to bills of lading, dated Brussels the 25th August, 1924 as enacted in the country of shipment shall apply to this Contract. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsory [sic] applicable, the terms of the said convention shall apply.
 
 
 10
 It also provides that the "Carrier's Standard Conditions of Carriage incorporate the Hague Rules contained in the Brussels Convention dated 25th August 1924 and any compulsorily applicable national enactment of these rules."
 
 
 11
 At Southampton, the M/V Seijin also took on for carriage to Baltimore eighty-one pieces of construction equipment from JCB for which it issued a DFR identical to Caterpillar's Southampton DFR. After a stop in Halifax, the M/V Seijin delivered the bulk of the cargo at Baltimore in seriously damaged condition. In the district court, the defendants sought unsuccessfully to limit their liability to $500 per package pursuant to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. §§ 1300 et seq.
 
 
 12
 COGSA represents the codification of the United States' obligations under the International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, August 25, 1924, 51 Stat. 233. This convention, which is also known as the Hague Rules, was the culmination of a multinational effort "to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers inter se in international trade." Robert C. Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 301, 79 S.Ct. 766, 768, 3 L.Ed.2d 820 (1959). Among the more prominent features of COGSA is its limitation of liability in the event of damage to or loss of cargo to "$500 per package ... or ... per customary freight unit ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading." 46 U.S.C.App. § 1304(5).
 
 
 13
 The Hague Rules, as enacted in COGSA, have remained the law in the United States since 1936 notwithstanding dramatic changes in the shipping industry. These changes prompted the convening of a diplomatic conference in 1968 which adopted a Protocol amending several provisions of the Hague Rules. Among other things, this Protocol, known as the Visby Amendments, increased the limitation on the carrier's liability to the higher of "the equivalent of 10,000 francs per package or unit or 30 francs per kilo of gross weight of the goods lost or damaged." Protocol to Amend the International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, Feb. 23, 1968, reprinted in 6 Benedict on Admiralty 1-25 to 1-29 (7th ed.1997). A subsequent 1979 Protocol further amended the limitation to provide for its calculation based on "special drawing rights," fluctuating units of account determined by the International Monetary Fund. Protocol Amending the International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, Dec. 21, 1979, reprinted in 6 Benedict, supra, at 1-32.2 to 1-32.5.
 
 
 14
 Because the United States ratified neither the Visby Amendments nor the 1979 Protocol, the $500 liability limitation controls in cases where COGSA applies. Both Belgium and the United Kingdom, however, employ the higher limitation set out in the 1979 Protocol. The difference in liability schemes is significant. If the $500 limitation of COGSA had been applied, defendants' liability to JCB would have been $18,061.84 rather than the $648,662.35 determined by the special drawing right. Similarly, defendants' liability to Caterpillar would have been $5,094.06 rather than the $128,141.36 pursuant to the special drawing right. The dispute in this case focuses primarily on whether the language in the DFRs expressing an intent to apply the "Hague Rules ... as enacted in the country of shipment" includes the Hague Rules as amended by the subsequent protocols.
 
 
 15
 In an opinion reported at 921 F.Supp. 1168 (S.D.N.Y.1996), Judge Pollack ruled that COGSA did not apply to the shippers' claims because the DFRs were not documents of title and therefore could not be bills of lading as that term is used in 46 U.S.C.App. § 1301(b). The district court went on to hold that the "as enacted" language of the DFRs evinced an intent to apply the Hague Rules that were in force in the countries of shipment, i.e. the Hague Rules as amended by the protocols.
 
 
 16
 Appellants contend that the district court made a number of errors. We turn first to Wallenius's contention that the district court erred in holding COGSA inapplicable on the ground that a DFR is not a "bill of lading or similar document of title" within the meaning of COGSA. COGSA applies to "all contracts for carriage of goods by sea to or from ports of the United States in foreign trade." Id. § 1312. However, the enacting clause of COGSA provides that it regulates rights and liabilities under "[e]very bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade." 46 U.S.C.App. § 1300. Section 1301(b) defines "contract of carriage" as applying "only to contracts of carriage covered by a bill of lading or any similar document of title, insofar as such document relates to the carriage of goods by sea."
 
 
 17
 Wallenius concedes that the DFRs are not documents of title, a concession compelled by the disclaimers appearing on the face of the documents. However, despite taking great pains to distance the DFRs from bills of lading, as evidenced by the provision that "[e]very reference" in the standard conditions of carriage to the phrase "bill of lading" is to "be read and construed as a reference to the words 'Non-Negotiable Datafreight Receipt,' " Wallenius contends that DFRs are forms of sea waybills and, as such, are the functional equivalent of non-negotiable straight bills of lading. There is ample authority, however, for the proposition that all bills of lading are documents of title. For example, section 1-201(15) of the Uniform Commercial Code states that " 'Document of title' includes bill of lading." See 1 Ronald Anderson, Anderson on the Uniform Commercial Code 1-201 (3d ed. 1996) ("A bill of lading ... is a document of title."); see also Wharton Poor, American Law of Charter Parties and Ocean Bills of Lading § 59, at 134 (5th ed.1968); Stasia M. Williams, Something Old, Something New: The Bill of Lading in the Days of EDI, 1 Transnat'l L. & Contemp. Probs. 555, 560 (1991); Associated Metals & Minerals Corp. v. S/S Jasmine, 983 F.2d 410, 413 (2d Cir.1993); Chase Manhattan Bank v. Nissho Pac. Corp., 22 A.D.2d 215, 224, 254 N.Y.S.2d 571 (N.Y.App.Div.1964), aff'd, 16 N.Y.2d 999, 265 N.Y.S.2d 660, 212 N.E.2d 897 (1965). An argument that, although a DFR is not a document of title, it is at the same time the functional equivalent of a non-negotiable bill of lading, which is by definition a document of title, is somewhat of an oxymoron.
 
 
 18
 In the final analysis, resolution of the issue whether the DFRs in the instant case are contracts of carriage under COGSA is not determinative of the issue of damages. Section 4(5) of COGSA, 46 U.S.C.App. § 1304(5), which contains the $500 maximum per package limitation, provides:
 
 
 19
 By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: Provided, That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained.
 
 
 20
 If, as the district court held, the Hague Rules as modified by the Visby Amendments were incorporated into the contract of carriage, this constituted an agreement within the meaning of section 4(5). See Francosteel Corp. v. M/V Deppe Europe, No. 90 Civ. 1442, 1990 WL 121683, at * 2 (S.D.N.Y. Aug. 10, 1990); Daval Steel Prods. v. M/V Acadia Forest, 683 F.Supp. 444 (S.D.N.Y.1988).
 
 COGSA elsewhere provides:
 
 21
 A carrier shall be at liberty to surrender in whole or in part all or any of his rights and immunities or to increase any of his responsibilities and liabilities under this chapter, provided such surrender or increase shall be embodied in the bill of lading issued to the shipper.
 
 
 22
 46 U.S.C.App. § 1305. Professors Gilmore and Black rely upon this latter section in their seminal treatise to support the proposition that COGSA:
 
 
 23
 allows a freedom of contracting out of its terms, but only in the direction of increasing the shipowner's liabilities, and never in the direction of diminishing them.
 
 
 24
 Gilmore & Black, The Law of Admiralty 145 (2d ed.1975). This proposition long has been accepted by the courts. See, e.g., Hanover Ins. Co. v. Shulman Transp. Enterprises, Inc., 581 F.2d 268, 273 & n. 8 (1st Cir.1978); Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 815 (2d Cir.1971); Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer, 422 F.2d 7, 12 (2d Cir.1969), cert. denied, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). Thus, as the shippers contend, if we sustain the district court's finding that the parties intended to incorporate higher liability limitations into their contracts of carriage, it simply does not matter whether or not the DFRs are bills of lading covered by COGSA.
 
 
 25
 Because COGSA continues to exist, the provisions at issue herein are not governed by the Harter Act, 46 U.S.C.App. §§ 190 et seq., a backup contention of appellants. With the enactment of COGSA, Harter's coverage for damage occurring at sea was "superseded" or "repealed." Gilmore & Black, supra, at 147. Assuming for the argument that the parties herein could by agreement restore life to Harter, there is nothing in the record to indicate that they intended to do so. Indeed, the evidence is clear that the parties did not so intend.
 
 
 26
 As set out above, the DFRs state that they are to be governed by:
 
 
 27
 The Hague Rules contained in the international convention for the unification of certain rules relating to bills of lading, dated Brussels the 25th August, 1924 as enacted in the country of shipment....
 
 
 28
 The district court held that the language " 'as enacted in the country of shipment,' incorporates the Hague Rules in the manner that England has enacted them: to wit, including the Visby Amendments and the 1979 Protocol." 921 F.Supp. at 1171.
 
 
 29
 Influenced in substantial part by the titular word "Amendments," we agree with the district court's holding. See People v. Sarver, 102 Ill.App.3d 255, 57 Ill.Dec. 834, 429 N.E.2d 1108, 1109 (1981) ("An amendment is that which alters 'by modification, deletion, or addition.' ... By definition, an amendment is something which incorporates by reference some or all of a previously filed document.") (quoting Black's Law Dictionary 74 (5th ed.1979)); Greenville Community Hotel Corp. v. Alexander Smith, Inc., 230 S.C. 239, 95 S.E.2d 262, 265 (1956) ("[T]he term 'amendment' by very definition connotes alteration, improvement or correction, and thus negates the idea of destruction or elimination of the original."). Thus, when a litigant appears before this Court asserting a constitutional right of due process, we recognize it as such despite the fact that it is contained in the Fifth Amendment.
 
 
 30
 The district court recognized that the Visby Amendments are drafted in such a way as to supplement the Hague Rules rather than supplant them. Article 6 of the Visby Amendments, for example, reads:
 
 
 31
 As between the Parties to [the Visby Amendments] the [Hague Rules] and the [Visby Amendments] shall be read and interpreted together as one single instrument.
 
 
 32
 Reprinted in 6 Benedict, supra, at 1-28.
 
 
 33
 In addition to the court below, three district courts have held that a document incorporating the law of the country of shipment, as in the instant case, adopted that country's interpretation of the Hague Rules, which treated the Rules and the Amendments together. Ilva U.S.A., Inc. v. M/V Botic, No. 92-717, 1992 WL 296562, at * 2 (E.D.Pa. Oct.6, 1992), aff'd mem., 998 F.2d 1003 (3d Cir.1993); Associated Metals & Minerals Corp. v. M/V Arktis Sky, No. 90 Civ. 4562, 1991 WL 51087, at * 3 (S.D.N.Y. Apr.3, 1991); A.T.I.C.A.M. v. Cast Europe (1983) Ltd., 662 F.Supp. 1443, 1448 (N.D.Ill.1987). Although there is some authority to the contrary, see, e.g., Sunds Defibrator, Inc. v. M/V Atlantic Star, 1986 AMC 368 (S.D.N.Y.1983), we find the reasoning in the three above-cited cases to be more persuasive.
 
 
 34
 Like the district court, we note a significant analogy in the English Carriage of Goods by Sea Act 1971, which, as the district court noted, reads as an amendment to existing law, i.e. the Hague Rules, and not as an independent statute. See 921 F.Supp. at 1171 (citing 43 Halsbury's Laws of England 522-23 (4th ed.1983)).
 
 
 35
 Contrary to appellants' assertions, the district court's interpretation of the DFRs does not contravene Indussa Corp. v. S.S. Ranborg, 377 F.2d 200, 203 (2d Cir.1967) (in banc). Indussa, recently overruled by Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995), held that forum selection clauses were invalid under COGSA because requiring "an American plaintiff to assert his claim only in a distant court lessens the liability of the carrier" in contravention of 46 U.S.C.App. 1303(8). 377 F.2d at 203. This was true not only because of the added expense of litigating abroad, but also because trial "in a foreign court would almost certainly lessen liability if the law which the court would apply was neither [COGSA] nor the Hague Rules." Id.
 
 
 36
 While application of the Visby Amendments might lessen a carrier's liability under COGSA in a general sense, see William Tetley, Limitation, Non-Responsibility and Disclaimer Clauses, 11 Mar. Law. 203, 225-26 (1986) (listing situations where use of Visby Amendments would operate to relieve carrier of liability in contravention of § 1303(8)), hypothetical examples have little relevance to the case before us. The sole issue in the instant case is whether the parties intended to apply the higher liability limitation of the Hague Rules as enacted in the countries of shipment. Giving effect to that intent does not offend § 1303(8) of COGSA.
 
 
 37
 The judgments of the district court are affirmed.