**WESTERN NATURAL GAS COMPANY,**
Defendant Below, Appellant,

v.

**CITIES SERVICE GAS COMPANY,**
Plaintiff Below, Appellee.

Supreme Court of Delaware.

Oct. 12, 1966.

Rehearing Denied Nov. 1, 1966.

Clair John Killoran and Courtney H. Cummings, Jr., of Killoran & VanBrunt, Wilmington (Lidden, Austin, Dawson & Sapp, Houston, Tex., of counsel), for appellant.

John J. Morris, Jr., Howard L. Williams, and Henry N. Herndon, Jr., of Morris, James, Hitchens & Williams, Wilmington (Charles V. Wheeler, Oklahoma City, Okl., of counsel), for appellee.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

CAREY, Justice.

The sole issue presented in this appeal from the Superior Court is whether the undisputed evidence in the record justifies the holding that a contract existed between the parties whereby Western Natural Gas Company (Western) is obligated to repay Cities Service Gas Company (Cities) the amount of certain overpayments for natural gas.

Prior to the present appeal, the case was before us upon a different issue, i. e., whether Cities was entitled to recover the overpayments upon a theory of restitution because they were made under duress or business compulsion. See Del., 201 A.2d 164. The majority of the Court then held that the record was insufficient to justify summary judgment upon that ground. Although the present contract theory was argued, we declined to pass upon it because the question had not been decided by the Court below and was not raised here until reargument. Following an unsuccessful attempt by Western to have the matter reviewed by the United States Supreme Court, 379 U.S. 905, 85 S.Ct. 189, 13 L.Ed. 2d 177, additional affidavits were filed in Superior Court, after which Cities renewed its motion for summary judgment on the contract theory. That Court ruled in Cities' favor.

Because many of the facts have been set forth in our previous opinion, supra, we will state only those presently pertinent. The parties, prior to January 1st, 1954, were bound by a contract whereby Western supplied natural gas to Cities from the Hugoton Field at a price of 8¢ per thousand cubic feet. That contract was subject to all "valid orders, rules and regulations of any regulatory body having jurisdiction". Effective as of that date, the Corporation Commission of Kansas promulgated an order setting a minimum price of 11¢ per M. C. F. for gas produced from the Hugoton Field. Cities immediately filed suit challenging the validity of that order and was ultimately successful in having it declared invalid. Cities Service Gas Company v. State Corporation Commission, 355 U.S. 391, 78 S.Ct. 381, 2 L.Ed.2d 355.

On January 21st, 1954, before making any payments at the 11¢ rate, Cities wrote the following letter to Western:

"The State Corporation Commission of the State of Kansas by Order dated December 2, 1953, in Docket No. 44099–C (C–3216) directed that on and after January 1, 1954, as a condition precedent for withdrawal of gas from the Hugoton Gas Field in Kansas, there shall be paid therefor or attributed thereto, at the wellhead, a minimum price of not less than eleven cents (11¢) per M. c. f. (14.65 pounds p.s. i. a.).

"Cities Service Gas Company and certain other parties filed Petitions in the District Court of Finney County, Kansas, for a judicial review of the said Order.

"Pending final judicial determination of the said Order and beginning January 1, 1954, Cities Service Gas Company intends to pay for all gas purchased by it in the Kansas Hugoton Field in strict

compliance with the terms and conditions of the said Order. Such compliance with said Order by this Company, however, is made to avoid the penalties provided by the Kansas statutes for a violation thereof, and the payments made to you in compliance with said Order pending its final judicial determination are to be considered and accepted by you as involuntary payments on our part, without prejudice to our rights in said litigation, and in no event as an acquiescence by us in the validity of said Order.

"In the event the said Order is finally judicially modified or declared to be invalid in whole or in part, as a result of which you have been overpaid for gas purchased during the interim aforesaid, Cities Service Gas Company will expect you to refund to it the amount of said overpayments."

Thereafter, payments by Cities were made at the rate of 11¢ by monthly checks which were received and cashed by Western without comment. To each check was attached a voucher which contained a statement that the payment was made subject to the provisions of the letter of January 21, 1954.

After the decision in Cities Service Gas Company v. State Corporation Commission, supra, was handed down in January 1958, Cities resumed making payments at the 8¢ rate, and demanded the refund of the "excess" which it now seeks to recover in this action.

Cities presently relies upon the theory that the letter of January 21st, 1954 constituted an offer which was accepted by the receipt and cashing of the checks, whereby a contract, or a modification of the original contract, was created under which Western agreed to repay the excess if and when the Kansas Order was found

invalid. The Court below accepted that theory.

Western denies that any refund contract was created. It argues that the letter of January 21, 1954 was nothing more than a statement by Cities of its intent to pay the 11¢ rate; that its language was inadequate to put Western on notice of any intent to make an offer or to call upon Western to agree or disagree; that the language on the check vouchers was insufficient to bind Western in any way; and that prior and subsequent conduct of the parties demonstrates the lack of an intent by either party to create a refund contract.

Cities cites two cases which it contends involved the same factual situation; Western contends that they are basically different and in fact lend no aid to Cities. Those cases are Cities Service Gas Company v. United Producing Company, D.C., 212 F.Supp. 116, and Northern Natural Gas Company v. Landon, D.C., 212 F.Supp. 856, affd. 10 Cir., 338 F.2d 17, cert. den. 381 U.S. 914, 85 S.Ct. 1529, 14 L.Ed.2d 435. Both of them were suits for refunds of alleged overpayments made because of the same price order of the Kansas Corporation Commission. We pause to examine them.

In the United case, Cities wrote to United exactly the same letter on the same date as the one written to Western. Shortly thereafter United suggested a modification which was refused by Cities, whereupon United accepted the terms originally proposed with a minor change[1] which Cities apparently did not accept. Cities then proceeded to make payments by voucher checks precisely like those sent to Western, the vouchers referring to Cities original letter of January 21, 1954. The Court made this finding:

"Plaintiff's letter dated January 21, 1954, plaintiff's Exhibit 4, constituted a tender of the minimum price of 11¢ per

---

[1] The suggested change was this: "In the event, however, any of your other suppliers of gas in the Kansas Hugoton Field are granted any limitation or qualification with respect to their obligation to make such refund, United Producing Company. Inc. will expect its obligation with respect thereto to be relaxed to the same extent".

Mcf upon condition that the difference between the contract price, 7¢ per Mcf, 16.4#psia, and the price paid in compliance with the invalid Kansas Order, be refunded by defendant to plaintiff if and when that Order should be adjudged invalid. The subsequent acceptance by defendant of the monthly payments tendered by voucher check, containing a notation that payment was made subject to the terms of the January 21 letter, constituted an acceptance by defendant of plaintiff's offer to pay upon said condition of refund. Therefore, there is a binding contract between the parties for defendant to make the refund sued for here."

Western contends that the United decision is not persuasive here because United in fact treated Cities' letter as an offer which it accepted, whereas Western did not consider it to be an offer and did not accept it. It will be noted, however, that the Court's finding made no mention of United's letters but expressly based its conclusion of acceptance upon the original letter and the acceptance of the voucher checks. We cannot surmise that this was an oversight on the Court's part; the finding may be explainable by the fact that United's last letter contained a variation (although minor) from the terms stated originally by Cities. Through the vouchers, Cities indicated reliance upon its original proposition. As we analyze the opinion and that part of the record which is before us, the facts in the United case are substantially the same as the present one with respect to the creation of the refund contract.

In the Landon case, the situation was not precisely the same. Northern wrote to Landon on February 23, 1954 that it would pay the 11¢ rate "upon the condition that you will refund * * * the entire amount of the increase" if the Kansas Order should be determined invalid. Its payments after the first letter were by checks which bore an endorsement that they were "accepted subject to conditions of the 2/23/54 letter". Landon accepted those checks without ques-

tion. The trial Court found the existence of a contract to refund.

Western now suggests that Landon made no real issue about the existence of a refund contract, but claimed that it was actually an agreement to refund only the excess over a prior Kansas rate order of 8¢ rather than the lower rates of the original contract. This suggestion is not in harmony with the opinion of either the trial or appellate Court in the Landon case. The District Court did not mention the 8¢ rate; the reason for that silence appears in the Appellate Court opinion, wherein it is pointed out that the original answer denied the existence of any refund contract and that the matter of rates was not brought into the case until about a month after the District Court's decision— some two years after the original answer. The lower Court refused to permit the amendment because of its lateness. Clearly, the creation of the refund contract was specifically found and affirmed on appeal. There is a difference, of course, in the language used by Northern in both its letter and the endorsements on its checks from that used by Cities, but we think the real meaning is the same. The mere fact that Northern placed the endorsements on the checks themselves rather than on attached vouchers is of no significance; no rights of third-party holders are involved.

■ To determine the existence or nonexistence of a contract, we may consider the circumstances surrounding the transaction and what the parties said and did. McCormick on Evidence § 219. The letter of January, 1954 does not say in so many words that Cities was thereby making an offer to pay the increased price on condition that Western agree to refund the excess if the regulation should be held void. It is difficult, however, to believe that it could reasonably be understood to mean anything else. Neither party then knew whether the Kansas order was binding. Neither party knew how long a period would be required to obtain a final ruling and thus find out which price was controlling. If the regula-

tion was valid, the only lawful price was 11¢; if it was not valid, the contract price remained at 8¢. Cities expressed its belief that the regulation was invalid, but apparently Western thought otherwise. Both parties must have realized that many thousands of dollars would be involved; the ultimate excess allegedly totaled over one and a quarter millions excluding interest, or almost $30,000 per month. It is not realistic to think that Cities intended its letter to mean that it was voluntarily going to pay the increased price, notwithstanding its expressed belief in its invalidity and notwithstanding its suit to have it declared so, with nothing more than the hope that Western would repay it if Cities prevailed in its suit. Cities said, in effect, that it was afraid of criminal sanctions (a fear which later proved groundless), that the payments were involuntary and that it would "expect" reimbursement from Western if the contingency happened. The word "expect" is frequently used to mean more than "hope" or "anticipation"; one acceptable definition found in Webster's Third New International Dictionary is to "consider (a person) obligated or in duty bound, as in the expression 'England expects every man to do his duty' ". A definition of the word given in Funk & Wagnalls Dictionary is "to count upon as right and due; rely upon; require". This meaning has been accepted in a number of cases, depending upon the context and the surrounding circumstances. Sillman v. Spokane Savings & Loan Soc., 103 Wash. 619, 175 P. 296; Orr v. State, 40 Ala.App. 45, 111 So.2d 627; Wattjes v. Faeth, 379 Ill. 290, 40 N.E.2d 521; Holcomb v. Holcomb, 173 Miss. 192, 159 So. 564; Osborne v. McWilliams Dredging Co., La.App., 176 So. 410.

■ In the light of the circumstances and the position in which the parties found themselves at the time, we think the only reasonable interpretation of Cities' letter is that it was an offer to pay the increase upon the condition of a refund if the regulation should be found invalid. Acceptance of the payments without protest or objection was an acceptance of the offer.

■ After this case was remanded to the Superior Court, considerable additional material was brought into the record through affidavits. Western contends that the Court erred in granting summary judgment on the ground that these affidavits demonstrated the existence of disputed material facts. It suggests that a jury could find from the evidence a lack of any intent on Western's part to enter into any contract to refund. We have examined the affidavits and find nothing therein to prevent summary judgment. Western's subjective intent is not controlling. 1 Williston on Contracts (3d ed.) Ch. 2 & 3; 9 Wigmore on Evidence (3d ed.) § 2413; Restatement of Contracts § 71; 17 C.J.S. Contracts § 32, p. 640.

In Eustis Mining Co. v. Beer, Sondheimer & Co., D.C., 239 F. 976, Judge Learned Hand had this to say:

"All the attendant facts constituting the setting of a contract are admissible, so long as they are helpful; the extent of their assistance depends upon the different meanings which the language itself will let in. Hence we may say, truly perhaps, that, if the language is not ambiguous, no evidence is admissible, meaning no more than that it could not control the sense, if we did let it in; indeed, it might 'contradict' the contract—that is, the actual words should be remembered to have a higher probative value, when explicit, than can safely be drawn by inference from surroundings. Yet as all language will bear some different meanings, some evidence is always admissible; the line of exclusion depends on how far the words will stretch, and how alien is the intent they are asked to include".

■ Similar views are expressed in 9 Wigmore on Evidence (3d ed.) § 2466. Having found what we consider to be the only reasonable meaning of Cities' letter, any other evidence of attendant facts and

**384**

circumstances becomes unnecessary and therefore inadmissible.

 Finally, Western suggests that there was no consideration for a contract and that it lacks mutuality. We cannot agree. Cities for the time being gave up its right to litigate the rate question as against Western and agreed to make the higher payments pending the outcome of its litigation. That detriment not only furnished sufficient consideration for Western's promise to refund, see Autographic Register v. Phillip Hano Co., 1 Cir., 198 F.2d 208; it also provided the necessary mutuality. 70 C.J.S. Payment § 144, p. 349.

The judgment below must be affirmed.