15-1285-cv
Umbach v. Carrington Investment Partners (US), LP

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2015

Argued: April 5, 2016          Decided: March 13, 2017

Docket No. 15-1285-cv

_____

JOSEPH UMBACH,

*Plaintiff-Appellee*,

- v. -

CARRINGTON INVESTMENT PARTNERS (US), LP, CARRINGTON
CAPITAL MANAGEMENT, LLC, and BRUCE ROSE,

*Defendants-Appellants*.

_____

Before: KEARSE, CABRANES, and CHIN, *Circuit Judges*.

Defendants appeal from a judgment entered in the United States District Court for the District of Connecticut, Jeffrey Alker Meyer, *Judge*, requiring them to pay plaintiff $1,335,137.55 in damages plus $529,409.48 in prejudgment interest for breach of a limited partnership agreement ("Agreement") that, at the time it was entered into by the plaintiff limited partner, allowed such a partner to withdraw part or all of his interest in defendants' hedge fund. Defendants principally contend that the district court, Ellen Bree Burns, *Judge*, to whom the action was previously assigned,

erred (1) in granting summary judgment against them on the ground that their acts to modify the Agreement--after plaintiff had given notice of withdrawal in conformity with the Agreement's terms--to allow rejection of that notice constituted a breach, and (2) in calculating the dollar amount plaintiff would have received but for the breach. While we see no error in the court's ruling on liability, we conclude that there were factual issues to be tried as to the calculation of damages.

Vacated and remanded for further proceedings as to damages.

EDWARD TOPTANI, New York, New York, *for Plaintiff-Appellee*.

LAURA K. LIN, Los Angeles, California (William D. Temko, Munger, Tolles & Olson, Los Angeles, California; Jeffrey R. Babbin, James O. Craven, Wiggin and Dana, New Haven Connecticut, on the brief), *for Defendants-Appellants*.

KEARSE, *Circuit Judge*:

Defendants Carrington Investment Partners (US), LP, *et al*., a hedge fund and its managers (collectively "Carrington"), appeal from a judgment entered in the United States District Court for the District of Connecticut, Jeffrey Alker Meyer, *Judge*, requiring them to pay plaintiff Joseph Umbach, the indirect purchaser and assignee of a limited partnership interest in defendants' fund, $1,335,137.55 in damages plus $529,409.48 in prejudgment interest for breach of the limited partnership agreement ("Agreement" or "LPA") which, at the time it was entered into by Umbach's assignor, allowed a limited partner under stated conditions, including 30 days' advance notice, to withdraw part or all of his interest in the hedge fund. The district court, Judge Ellen Bree Burns, to whom the action was previously assigned, granted Umbach's motion for summary judgment, ruling (1) that defendants' actions--after Umbach had given notice of withdrawal in conformity with the Agreement's terms--in causing the LPA to be modified, without the consent of all limited partners, to facilitate defendants' nullification of Umbach's notice of withdrawal constituted a breach of the

Agreement, and (2) that Umbach was entitled to recover $1,335,137.55 in contract damages, representing his share of the fund's net asset value as of the date his interest, in accordance with the relevant Agreement, was entitled to be withdrawn. Defendants contend principally (1) that the court erred in its interpretation of the LPA and should have granted summary judgment in their favor on the issue of liability, and (2) that, in any event, permitting Umbach to withdraw from the fund would have precipitated a sale of fund assets at distressed prices, making it impossible for Umbach to receive more than a minuscule distribution, if any. For the reasons that follow, we reject defendants' challenges to the district court's ruling on the issue of liability, but we conclude that factual questions prevented the court from calculating as a matter of law the amount that Umbach would have received if his withdrawal request had been honored.

# I. BACKGROUND

Defendant Carrington Investment Partners (US), LP (the "Fund"), was a hedge fund that invested in securities linked to single-family residential subprime mortgages. The Fund was structured as a limited partnership; the Fund's general partner was defendant Carrington Capital Management, LLC ("CCM" or "General Partner"); defendant Bruce Rose was the president and managing member of the General Partner. Umbach became a limited partner in May 2005, indirectly investing $1 million in the Fund; he eventually acquired direct ownership of that interest through assignment. For purposes of this opinion, we will, as did the district court, "refer to Umbach as the original investor and attribute any relevant action by [Umbach's investment surrogate] to Umbach" himself, *Umbach v. Carrington Investment Partners (US), LP*, No. 3:08-cv-484 (EBB), 2014 WL

10537157, *1 n.1 (D. Conn. Apr. 23, 2014) ("*Umbach I*").  As described in *Umbach I*, most of the facts are not in dispute.

A.  Relevant Provisions of the Limited Partnership Agreement

We note, as did the district court, that although the limited partnership agreement that was in effect at the time of Umbach's 2005 investment was amended in 2006, the modifications did not change the LPA in any respect that is material to this action, and we too will refer to the 2006 version of the Agreement as the original agreement, *see Umbach I*, 2014 WL 10537157, at *1 n.2.

Under Delaware law--which the Agreement provided would be applicable--prior to the dissolution and winding up of a limited partnership, a limited partner may withdraw from the partnership "in accordance with the partnership agreement."  Del. Code Ann. tit. 6, § 17-603 (2015). With exceptions not relevant here, the LPA's original § 3.9.1, titled "Total and/or Partial Withdrawals by Partners; Penalties," provided, in pertinent part, that

> a Limited Partner may not withdraw any portion of its Capital Account with respect to each of its Interests . . . unless such portion has been invested with the Partnership for a period of not less than 12 months (the "lock-up period"). The General Partner may waive the lock-up period, in its discretion. *Following such lock-up period, a Limited Partner may, upon written request . . . withdraw all or a portion of his Interest as of the last Business Day of each quarter . . . .*  Written notice of such withdrawal in proper form must be received by the General Partner at least thirty (30) days prior to each Withdrawal Date, unless such notice is waived by the General Partner in its sole discretion. . . . *In the event of a total or partial withdrawal of . . . an Interest, the General Partner will distribute 90% of the amount withdrawn*, without interest, from the withdrawing Partner's Capital Account with respect to an Interest *generally within twenty (20) Business Days after the Withdrawal Date*, and *the balance, if any, will be distributed, with interest, after the completion of an audit. . . . A Partner* may revoke his notice of intent to withdraw on or prior to the Withdrawal Date by written instructions to the General Partner.

4

(Agreement § 3.9.1 (emphases added).)

That section also made provision for certain "Hardships" that would allow the General Partner to partially postpone withdrawal distributions by "certify[ing] that extraordinary circumstances exist[ed]," such as "the General Partner's inability to liquidate positions as of [a] Withdrawal Date" (Agreement § 3.9.1). It stated that in the event the General Partner provided a Hardships certification, the Fund could

> delay payment to Partners requesting withdrawal of the proportionate part of the value of withdrawn Interests represented by the sums which are the subject of such Hardships, in which event payment for withdrawal will be made to Partners as soon thereafter as is practicable following the end of such Hardships.

(*Id*.)

Section 11 of the LPA provided, with some stated exclusions, that the "General Partner and Limited Partners holding at least two-thirds (66 2/3%) of the outstanding Interests"--sometimes referred to as a supermajority--"have the right to amend" the LPA. (*Id*. § 11.1.) However, in a section titled "Restrictions on General Partner's Authority," the LPA provided that "*[n]otwithstanding anything in this Agreement to the contrary*, the General Partner may not, without the consent or ratification of the specific act by *all* the Limited Partners . . . do any act in contravention of this Agreement . . . ." (*Id*. § 5.3(a)(i) (emphases added).)

B.  Umbach's Notice of Withdrawal and Carrington's Response

On July 11, 2007, more than a year after the end of his lock-up period, Umbach submitted to CCM a written request to withdraw his entire interest in the Fund. In accordance with § 3.9.1, he designated September 28, 2007, the last business day of the third quarter of 2007, as the withdrawal date.

5

On August 30, 2007, Carrington proposed to the limited partners an Amendment of § 3.9.1 to be effective "September 30, 2007," which added the following new first sentence:

> Unless earlier declared by the General Partner . . . the next Withdrawal Date shall be September 30, 2008 . . . and Withdrawal Requests pending on or prior to the date hereof shall be deemed to be rescinded and of no further force or effect.

(Amendment No. 1, dated as of September 30, 2007, to [the original] Agreement of Limited Partnership 1-2.) The district court noted that, as thus proposed, the Amendment's literal "effective date [would have been] two days *after* Umbach's withdrawal request was to take effect," *Umbach I*, 2014 WL 10537157, at *2 n.3 (emphasis added). However, because the effective date of the Amendment was not material to the resolution of Umbach's breach-of-contract claim, the court accepted, for purposes of considering Carrington's summary judgment motion, "Carrington['s] assert[ion] that the Amendment was actually *meant* to take effect on September 28, 2007." *Id.* (emphasis added).

Umbach voted against the proposed Amendment, as did some other limited partners. However, the proposal was approved by more than two-thirds of the limited partners, and CCM deemed it adopted. Thus, the Amendment (1) imposed a new, not-previously-contemplated, 12-month lock-up period, and (2) retroactively rescinded pending withdrawal requests. CCM treated Umbach's withdrawal notice as rescinded and refused to pay him his interest in the Fund.

C. The Present Action and the Cross-Motions for Summary Judgment

Umbach commenced the present action against Carrington in 2008 and filed a First Amended Complaint in 2011 alleging, to the extent pertinent to this appeal, that defendants' rejection of his withdrawal request constituted a breach of the LPA. He alleged that Carrington's purported

6

amendment of the Agreement was in contravention of the terms of the LPA and thus impermissible, and he principally requested rescission of the Agreement and restitution of his $1 million investment, plus interest. Defendants denied that there was any breach, and asserted, *inter alia*, that the Amendment of the LPA was duly authorized and that it nullified Umbach's withdrawal request. They also raised 18 affirmative defenses, including the assertion that if Umbach had suffered any damages he had failed to mitigate those damages.

Following completion of discovery, both sides moved for summary judgment. As discussed in greater detail in Part II.B. below, defendants presented, *inter alia*, the declaration of CCM's Chief Strategy Officer, stating (a) that by early summer in 2007 the market for subprime-mortgage-backed securities "had completely shut down"; (b) that a substantial number of limited partners in addition to Umbach had sent Carrington requests to withdraw their interests as of September 28, 2007; and (c) that the Fund could not have satisfied more than a fraction of those requests with the cash it had on hand and would have had to sell securities at depressed prices to meet all of them. (Declaration of Darren A. Fulco dated November 4, 2013 ("Fulco Declaration" or "Fulco Decl."), ¶¶ 7-10.) Defendants claimed that the Amendment was necessary to avoid having to liquidate the Fund; they also stated that in proposing the Amendment and rejecting Umbach's withdrawal request, they had consulted with counsel and believed that those acts were within the authority conferred on them by the LPA. (*See* Fulco Decl. ¶¶ 20-24.) Defendants contended that § 5.5.1 of the LPA thus immunized CCM and Rose from an award of damages for those acts.

Umbach argued that the purported amendment was ineffective because § 5.3 of the LPA expressly provided that notwithstanding any other provision in the LPA, the General Partner could not take any action in contravention of the LPA without the consent of all of the limited partners.

1.  Partial Summary Judgment as to Liability

In *Umbach I*, the district court partially dealt with the issue of liability on Umbach's breach-of-contract claim.  It stated that

> [t]he singular question of law underlying . . . the breach of contract . . . claim[] is whether the retroactive rescission provision of the Amendment--while ostensibly having obtained a supermajority vote of the Limited Partners pursuant to Section 11.1--was null and void because it constituted an "act in contravention of [the LPA]" and did not have the required consent of all Limited Partners in accordance with Section 5.3.

*Umbach I,* 2014 WL 10537157, at *3.  It noted that "neither party has argued that the LPA contains ambiguous terms pertaining to resolution of th[is] . . . claim[] . . . ."  *Id*. at *3 n.5.

While reserving decision on defendants' contention that the Agreement made CCM and Rose immune from a claim for damages, the district court concluded that defendants had breached the Agreement.  It noted that when Umbach made his withdrawal request,

> the LPA entitled Limited Partners (whose interests were not subject to lock-up) to withdraw their interest in the Fund at the end of each quarter upon written request.  Although the LPA required the Limited Partners to give the General Partner at least 30-days notice of a withdrawal request, the LPA did not authorize the General Partner to rescind (retroactively or otherwise) a timely and properly-made withdrawal request.  In fact, pursuant to the plain, unambiguous language of the LPA, just the opposite was true.
>
> Section 3.9.1 provided that "upon written request" made by a Limited Partner "at least thirty (30) days prior to" "the last Business Day of each quarter[,]" "the General Partner *will* distribute 90% of the amount [requested to be] withdrawn . . . from the withdrawing Partner's Capital Account . . . generally within twenty (20) Business Days after the Withdrawal Date, and the balance, if any, *will* be distributed, with interest, after the completion of an audit." (Emphasis added.)  Thus, per Section 3.9.1, once a Limited Partner submitted such a request, the General Partner was obligated to honor it, even if the General Partner could not do so immediately, *id*. (providing that under certain circumstances the "Partnership may . . . delay payment to Partners requesting withdrawal").  The redemption right conferred by Section 3.9.1,

8

then, was essentially a put option in that it gave a Limited Partner the right, but not the obligation, to withdraw his interest in the Fund; but, conversely, once exercised, *the General Partner was strictly obligated to redeem such an interest*.

*Umbach I*, 2014 WL 10537157, at *3-*4 (footnote omitted) (emphasis added).

The court ruled that the Amendment did not excuse defendants from that obligation.

Although § 11.1 of the LPA stated that amendment of the Agreement was allowed "with the consent of the General Partner and Limited Partners holding at least two-thirds (66 2/3%) of the outstanding interests in the Fund," *id*. at *2, the court pointed out that

> because Section 11.1 required the action and consent of the General Partner, the proposed Amendment also had to satisfy Section 5.3 of the LPA ("Section 5.3"), entitled "Restrictions on General Partner's Authority." That section provides that "[n]otwithstanding anything in this Agreement to the contrary, the General Partner may not, without the consent or ratification of the specific act by *all* the Limited Partners . . . (i) do any act in contravention of this Agreement[.]" (Emphasis added.)

*Umbach I*, 2014 WL 10537157, at *2. Noting that the term "contravention" was not defined in the LPA, the court reasoned that it should be given its common meaning. *Id*. at *4 n.7. As "contravene" commonly "means to come against something," *id*. at *4 (citing Webster's New International Dictionary (1959)), the court concluded that while an amendment could provide for a future event, "a contravention goes against, or undoes, something that already exists," *Umbach I*, 2014 WL 10537157, at *4. The court noted that "[t]he Amendment's rescission provision was retroactive, or backward-looking, in that it contravened--undid or voided--pending withdrawal requests." *Id*. at *4. It concluded that

> [a]s such, the Amendment triggered the requirement of Section 5.3, [and] could only become effective upon the consent of all Limited Partners. But because Umbach and other Limited Partners did not give their consent, that portion of the Amendment was not properly enacted and thus could not rescind pending withdrawal requests without running afoul of the LPA.

9

*Id.* ("[T]he Amendment's rescission of pending withdrawal requests constituted a contravention of the LPA--in that it rescinded existing withdrawal requests timely and properly made per Section 3.9.1 [without] the consent of all Limited Partners . . . .").

Thus, in light of § 5.3 and the LPA as a whole, the court concluded that "the Amendment did not, and could not, relieve Carrington of its obligation to honor Umbach's existing withdrawal request," and Umbach was therefore entitled to partial "summary judgment on his breach of contract claim as a matter of law." *Umbach I*, 2014 WL 10537157, at *4.

2. Summary Judgment as to Damages

After filing *Umbach I*, the district court instructed the parties to address remaining issues, including damages and claims of contractual immunity. In response, Umbach urged the court to grant him rescission or, in the alternative, damages. He argued that the value of his limited partnership interest on September 28, 2007, was $1,335,137.55 according to the Fund's financial statements, and that he had received no redemption proceeds.

Defendants principally urged the court to dismiss Umbach's contract claim summarily on the grounds, *inter alia*, that Umbach was not entitled to rescission because it was impossible to restore the status quo *ante*, and that he was not entitled to damages. They argued that without the Amendment, they would have been forced to liquidate the Fund; and after paying off its outstanding debt, the Fund would have had no assets with which to pay limited partners. Defendants also argued that in any event, CCM and Rose were contractually immune from liability for damages.

In a Judgment & Order on Cross-Motions for Summary Judgment Regarding Rescission, Damages, Immunity & Indemnification, the district court concluded that Umbach was not

entitled to rescission but was entitled to damages. *See Umbach v. Carrington Investment Partners (US), LP*, No. 3:08-cv-484 (EBB), 2015 WL 6125253, *1 (D. Conn. Mar. 18, 2015) ("*Umbach II*"). The court rejected Carrington's contention that Umbach could not prove injury, given that, according to the Fund's financial statements, Umbach's limited partnership interest had a value of more than $1 million on September 28, 2007, and his withdrawal request had been rejected. *See Umbach II*, 2015 WL 6125253, at *5-*6. The court found that Carrington's refusal to honor Umbach's proper withdrawal request went to the heart of the contract and that the breach was thus material. *See id*. at *3.

However, the court noted that "Delaware courts use rescission sparingly, and then usually only with respect to breaches of contract that result from fraud or mutual mistake," and that those courts "do not look favorably on parties who seek rescission based on . . . tactical maneuvering, especially when, such as here, an alternative and adequate remedy at law exists." *Id*. at *4. As Umbach had originally requested only rescission as a tactical move in order to avoid the Agreement's provision for arbitration of claims for damages, the court declined to grant the equitable relief of rescission.

The court proceeded to consider other issues raised by defendants as impediments to any award of damages. It ruled that Carrington had waived any right to invoke the LPA's mandatory arbitration provision because defendants themselves had engaged in extensive discovery in this action and had attempted to assert their own claims for damages against Umbach in this suit:

> [I]t is undisputed that in the course of this litigation Carrington filed a lawsuit on arbitrable claims by seeking to amend its Answer and add certain counterclaims for money damages against Umbach. *See* Defs.' Mot. to Amend [Doc. # 169]. Carrington also engaged in extensive discovery, some of which it then used as the basis for its proposed counterclaims. *See id*. By thus invoking the litigation machinery, Carrington waived its right to compel arbitration of Umbach's contract damages claim.

11

*Umbach II*, 2015 WL 6125253, at *4.

The court also rejected Carrington's claim that the LPA's "Liability and Indemnification" provision conferred on CCM and Rose immunity from damages. It noted that insofar as claims of limited partners were concerned, *see id*. at *7, that section provided that

> [t]he General Partner, its officers, directors, employees, shareholders, or affiliates will not be liable, responsible or accountable in damages or otherwise to . . . any of the Limited Partners, successors, assignees, or transferees, for any act or omission performed or omitted by it on behalf of the Partnership and *in a manner reasonably believed by it to be within the scope of the authority granted to it by this Agreement*[,] except when such action or failure to act constitutes gross negligence, fraud, or willful misconduct,

*id*. at *6 (quoting Agreement § 5.5.1 (emphasis ours)). Although defendants stated that they had consulted with counsel who helped to draft the Amendment, the court found that some of what they proffered in support of that position was inadmissible hearsay, *see Umbach II*, 2015 WL 6125253, at *8, and that they had provided no competent evidence to show, *inter alia*, "that counsel advised [Carrington] that the LPA authorized it to rescind pending withdrawals on less than the unanimous consent of the Limited Partners," or even that they had "disclosed to counsel all relevant facts pertaining to the Amendment," *id*. at *7. The court concluded that, on the evidence proffered by defendants, no rational juror could "make a preponderance finding that, in accordance with the above factors, Carrington held the requisite reasonable belief." *Id*. at *8.

The district court found that the amount of damages to which Umbach was entitled was $1,335,137.55, the amount shown in the financial statements provided by Carrington as his share of the net asset value ("NAV") of the limited partnership as of September 28, 2007. *See id*. at *5. The court rejected Carrington's contention that because the Fund lacked the cash to pay all limited partners who sent requests for withdrawals as of September 28, 2007, Umbach could not have been paid that sum:

12

[A]s Carrington would have it, . . . if it had honored Umbach's redemption request, Umbach and the other Limited Partners then seeking to withdraw their interests would have received little or next to nothing. But because no genuine dispute exists that the scenario Carrington draws is not what actually occurred, *i.e.*, it did not sell Fund assets or mark them to market, the Court must accept that the value of Umbach's interest on September 28 was the one indicated in the NAV statement that Carrington prepared and distributed to him.

. . . .

. . . [I]t appears that, for Carrington, breaching the LPA was simply a cost of doing business. Faced with a flood of redemption requests and a rapidly failing market for mortgage-backed securities, Carrington had two basic options: (1) honor the Limited Partners' withdrawal requests and be forced to liquidate assets at an enormous loss, thereby forgoing future management fees and any likely chance of weathering the economic storm; or (2) rescind pending withdrawal requests under the aegis of an amendment, thereby preserving the paper value of the Fund and the collection of management fees on the basis of that value--all the while hoping for a turnaround in the market and that none of the Limited Partners sues for breach of contract. Carrington, of course, chose the latter option and its decision has paid off in spades. It continued to collect management fees for several years after September 2007, totaling approximately $57 million, and none of the Limited Partners, save Umbach, has sued.

*Id*. at *6.

The court stated that the award of contract damages to Umbach was contingent upon his filing, within 10 days of *Umbach II*, a further amended complaint expressly requesting damages. *See id*. at *9. The court awarded prejudgment interest, to be "calculated as simple interest from October 26, 2007 to 15 days from the date of this judgment," *id*.; but it ordered that Umbach receive only 50% of the calculated amount because, in the court's view, "Umbach [wa]s at least equally to blame for the protracted pendency of this litigation," *id*. at *9 n.3.

3. The Final Judgment

Following the decision in *Umbach II*, Umbach duly filed a second amended complaint, requesting damages. He then moved for, *inter alia*, clarification and adjustment of the amount of

13

prejudgment interest he was to receive, and moved for entry of a final judgment. The action was thereafter reassigned to Judge Meyer.

Judge Meyer calculated that the amount of prejudgment interest to which Umbach was entitled was $529,409.48, and judgment was entered accordingly. Enforcement of the judgment was to be automatically stayed upon defendants' posting of a supersedeas bond.

## II. DISCUSSION

On appeal, defendants contend that the district court erred in its rulings on both liability and damages. With respect to liability, they argue principally that the Amendment to the LPA complied with the plain language of the Agreement; that the broad exculpation provisions of the Agreement preclude an award of damages against CCM or Rose; and that the court should not have allowed Umbach to amend the First Amended Complaint to include an explicit request for damages. With respect to damages, defendants contend principally that the award to Umbach of his share of the net asset value of the Fund as reported in their September 2007 financial report represents a windfall because Umbach's interest in the Fund would likely have been worthless if the Fund had been forced to liquidate in order to pay the withdrawal requests it had received. They also argue that, in any event, any award to Umbach must take into account distributions the Fund made to him after September 2007.

For the reasons that follow, we reject defendants' challenges to the rulings on liability; but we find merit in the contentions that there were factual issues precluding the quantification of damages as a matter of law and that the calculation of Umbach's damages should have taken into account the value of distributions the Fund made to Umbach after September 2007.

14

A.  The Liability Issues

Partial summary judgment as to the issue of liability may properly be granted only where there is no genuine dispute as to any material fact relevant to liability and the moving party is entitled to prevail on that issue as a matter of law.  *See*, *e.g.*, Fed. R. Civ. P. 56(a); *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010); *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 95 (2d Cir. 2007).  Summary judgment may be appropriate "in contract disputes where the language at issue is clear and unambiguous." *Riverbend Community, LLC v. Green Stone Engineering, LLC*, 55 A.3d 330, 334 (Del. 2012) ("*Riverbend*") (internal quotation marks omitted).

Under Delaware law, where contract language is clear and unambiguous, the meaning of the contract is a matter of law for the court.  *See*, *e.g.*, *id.*; *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779-80 (Del. 2012) ("*GMG Capital*"); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010) ("*Osborn*"); *Kuhn Construction, Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010) ("*Kuhn*"); *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Insurance Co.*, 616 A.2d 1192, 1195 (Del. 1992) ("*Rhone-Poulenc*"). However, "[w]here reasonable minds could differ as to the contract's meaning, . . . a factual dispute results," and its correct interpretation is not susceptible to resolution as a matter of law.  *Riverbend*, 55 A.3d at 334 (internal quotation marks omitted); *GMG Capital*, 36 A.3d at 783.  The determination as to whether a contract is ambiguous is also a matter of law for the court, *see*, *e.g.*, *id*. at 783 n.27; *Osborn*, 991 A.2d at 1160 ("determination of ambiguity lies within the sole province of the court"), and is subject to *de novo* review, *see*, *e.g.*, *Riverbend*, 55 A.3d at 334; *Osborn*, 991 A.2d at 1158; *Kuhn*, 990 A.2d at 396; *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) ("*Paul*").

15

If the court determines that the relevant contractual provision is ambiguous, extrinsic evidence may be considered, and the resolution of the ambiguity will generally be an issue for the factfinder. *See*, *e.g.*, *GMG Capital*, 36 A.3d at 783 n.27. But if the court determines that the contract is clear, the parol evidence rule bars consideration of extrinsic evidence that might undermine the plain language of the agreement. *See*, *e.g.*, *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."); *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991) ("if the instrument is clear and unambiguous on its face, neither this Court nor the trial court may consider parol evidence to interpret it or search for the parties' intent[]" (internal quotation marks omitted)).

The mere fact that the parties have inconsistent views as to the meaning of a given contract provision does not mean that that term is ambiguous or that there is an issue of fact to be tried.

> A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. . . . Ambiguity does not exist where the court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.

*Rhone-Poulenc*, 616 A.2d at 1196 (internal quotation marks omitted); *see also Paul*, 974 A.2d at 145-46 (other contract language may make clear the intended meaning of a disputed provision). If a contract's terms are found to be unambiguous, Delaware courts "give effect to the[ir] plain-meaning." *Osborn*, 991 A.2d at 1159-60; *see*, *e.g.*, *Paul*, 974 A.2d at 145 ("clear and unambiguous [contract] terms are interpreted according to their ordinary and usual meaning" (internal quotation marks omitted)).

16

The court is to "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage," *Kuhn*, 990 A.2d at 396-97, or "illusory or meaningless," *Osborn*, 991 A.2d at 1159 n.17 (internal quotation marks omitted); *see also GMG Capital*, 36 A.3d at 779 ("The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."); *Paul*, 974 A.2d at 145.

Finally, both in determining the meaning of a contract and in determining whether the contract is ambiguous, "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." *Kuhn*, 990 A.2d at 396 n.11 (internal quotation marks omitted); *see id*. at 396 ("A trial judge must review a contract for ambiguity through the lens of 'what a reasonable person in the position of the parties would have thought the contract meant.'" (quoting *Rhone-Poulenc*, 616 A.2d at 1197)); *Western Natural Gas Co. v. Cities Service Gas Co.*, 223 A.2d 379, 383-84 (Del. 1966) (affirming summary judgment where the contract had "only [one] reasonable meaning").

1. Interpretation of the LPA

Reviewing the limited partnership agreement in the present case *de novo*, we have no difficulty in agreeing with the district court's interpretation of the Agreement. As set forth in Part I.A. above, § 11.1 of the Agreement states that "[t]he General Partner and Limited Partners holding at least two-thirds (66 2/3%) of the outstanding Interests will have the right to amend this Agreement . . . ." That language makes clear that there can be no amendment to the Agreement without the concurrence of the General Partner.

However, the Agreement also, in the section titled "Restrictions on General Partner's Authority," places express restrictions on the authority of the General Partner to do certain acts despite any other LPA provision (Agreement § 5.3). That section provides, to the extent relevant here, that "*[n]otwithstanding anything in this Agreement to the contrary*, the General Partner may not, without the consent or ratification of the specific act by *all* the Limited Partners . . . do any act *in contravention of this Agreement . . . .*" (*Id*. § 5.3(a)(i) (emphases added).) This explicit limitation on CCM's authority means plainly that "[n]otwithstanding" the § 11.1 provision allowing the Agreement to be amended by the vote of the General Partner and two-thirds of the limited partners, § 5.3 does not allow the General Partner to consent to the adoption of, or to deem adopted, any amendment of the Agreement that is in "contravention" of the Agreement without the consent of "all" of the limited partners.

Defendants argue that the plain language of § 11.1 allowed them to deem the Amendment adopted so long as it obtained the consent of at least two-thirds of the limited partners (*see*, *e.g.*, Carrington brief on appeal at 34 ("the Amendment here did not 'contravene' the Agreement because Carrington took care to ensure the Agreement was amended pursuant to Section 11.1")). This argument might have some validity if the "[n]otwithstanding anything in this Agreement" clause were in § 11.1 of the Agreement rather than where it is, in § 5.3.

Defendants' argument ignores not only § 5.3 of the Agreement but also the distinction between an amendment to a contract and an act in "contravention" of the contract. The essential function of any amendment is to make a change. *See*, *e.g.*, *Webster's New International Dictionary* 83 (2d ed. 1957) (to "amend" is to "reform," or "modify," or "alter," "[h]ence, to change"). While some changes may be consistent with the terms of the document being amended, some changes will be inconsistent. To "contravene" means "to . . . act contrary to" something, or "to obstruct [its]

18

operation." *Id*. at 580; *see also id*. (to "contravene a law" means "to infringe or disregard" it). Thus, giving these terms their ordinary meanings, all amendments to an agreement are changes; but not all changes are contraventions.

To the extent that a proposed amendment to the LPA was contrary to a right conferred by the LPA or obstructed the operation of the LPA, the amendment was in contravention of the LPA. As to such a contravening amendment, § 5.3 of the Agreement clearly and unambiguously, "[n]otwithstanding anything in this Agreement"--which of course included LPA § 11.1--denied the General Partner authority to consent to that amendment or to deem it adopted without the consent of "all" of the limited partners.

As quoted in Part I.A. above, prior to Carrington's purported Amendment the LPA provided that, on 30 days' written notice to the General Partner after the initial 12-month lock-up period, "a Limited Partner may . . . withdraw all or a portion of his Interest" in the Fund at the end of the quarter (*see* Agreement § 3.9.1). It provided that, after such a notice, "the General Partner *will distribute* 90% of the amount withdrawn" "generally within twenty (20) Business Days after" the end of the relevant quarter, and that the remainder "*will be distributed*, with interest, after the completion of an audit." (*Id*. (emphases added).)

Although that section provided that "Hardships" could modify that obligation to make the requested distributions if the General Partner "certifie[d] that extraordinary circumstances exist[ed]," it did so only by providing that the General Partner could "delay" portions of such distributions (Agreement § 3.9.1 ("payment for withdrawal will be made to Partners as soon thereafter as is practicable following the end of such Hardships")). It did not indicate in any way that a properly communicated withdrawal request could simply be refused. Section 3.9.1 expressly provided that, at any time on or before the Withdrawal Date, such a withdrawal request could be rescinded by the

19

requesting limited "Partner . . . by written instructions to the General Partner"; significantly, it contained no provision for a limited partner's existing withdrawal request to be revoked *by* the General Partner.

In sum, § 3.9.1 clearly gave a limited partner the right, after the initial lock-up period, to request withdrawal of part or all of his partnership interest; and it equally clearly imposed on the General Partner the obligation to make payments to a limited partner who had made a proper withdrawal request.

Carrington does not dispute that Umbach in July 2007 made a proper withdrawal request. That request entitled him under § 3.9.1 to receive, within days after September 28, 2007, most of his share of the Fund, and, after an audit, to receive the rest.

In support of their contention that § 5.3(a)(i)'s denial of authority to the General Partner to contravene the Agreement without the consent all limited partners did not apply to their attempt under § 11.1 to amend § 3.9.1 with the consent of just two-thirds of the limited partners, defendants cite a quotation from our decision in *J.C.B. Sales Ltd. v. Wallenius Lines*, 124 F.3d 132 (2d Cir. 1997), which stated that "'[t]he term "amendment" by very definition connotes alteration, improvement or correction, and thus negates the idea of destruction or elimination of the original'" (Carrington brief on appeal at 34). Leaving aside the facts that that case was dealing not with an amendment of a contract but with an amendment to an international convention for the unification of certain rules relating to bills of landing, *see* 124 F.3d at 134--and that we, in turn, were quoting a case that dealt with a purported amendment to a complaint that instead of amending the existing claim replaced it with a wholly unrelated cause of action, *see Greenville Community Hotel Corp. v. Alexander Smith, Inc.*, 95 S.E.2d 262, 264 (S.C. 1956)--the quote itself undermines defendants' position. The effect, and indeed the very purpose, of the purported Amendment of § 3.9.1 was to destroy and eliminate

Umbach's contract right, following his proper request, to receive his interest in the partnership as of September 28, 2007.

We conclude that the provisions of the Agreement relevant to liability are clear and unambiguous. Section § 5.3 explicitly denied the General Partner authority to do any act in contravention of the Agreement without the consent of all limited partners; and the "[n]otwithstanding anything in this Agreement" clause in that section clearly limited the type of amendment that could be adopted pursuant to § 11.1 on the consent of as few as two-thirds of the limited partners. Giving effect to the Agreement as a whole, we conclude that the district court correctly ruled that defendants' actions in deeming the Amendment adopted over the objections of some limited partners, and in relying on the Amendment to rescind and nullify Umbach's properly made withdrawal request, constituted a breach of the Agreement.

We also conclude that the district court correctly rejected defendants' contention, *inter alia*, that CCM and Rose had contractual immunity from claims for damages. The Agreement provided immunity for the General Partner and its officers for acts (other than acts of gross negligence, fraud, or willful misconduct) that were performed "in a manner reasonably believed by [the General Partner] to be within the scope of the authority granted to it by this Agreement." (Agreement § 5.5.1.) Given the clear and unambiguous terms of the Agreement, and especially the fact that the "[n]otwithstanding anything in this Agreement" clause is part of § 5.3's limitations on the power of the General Partner, rather than part of § 11.1, any belief on the part of CCM or Rose that the Amendment in this case was within CCM's authority could not have been reasonable.

In sum, we see no error in the district court's rulings on liability.

21

2. Leave To Amend the Amended Complaint To Request Damages

Defendants also contend that the district court in *Umbach II* should not have allowed Umbach to amend his amended complaint in order to include an express request for damages. They argue principally (1) that the Agreement subjects a claim for damages to mandatory arbitration, and (2) that the belated amendment to include such a claim denied them the opportunity to conduct discovery on the issue of damages. Although Umbach in his original complaint and his First Amended Complaint principally sought rescission as relief for his breach-of-contract claim, we conclude that it was well within the discretion of the district court to allow him to further amend his complaint to request damages.

First, while Delaware has recognized that public policy favors the enforcement of agreements to submit disputes to arbitration, *see*, *e.g.*, *DMS Properties-First, Inc. v. P.W. Scott Associates, Inc.*, 748 A.2d 389, 391 (Del. 2000), it has also recognized that a party can waive its contractual right to arbitration by "actively participat[ing] in a lawsuit or tak[ing] other action inconsistent with th[at] right," *Falcon Steel Co. v. Weber Engineering Co.*, 517 A.2d 281, 288 (Del. Ch. 1986). The district court concluded that defendants' conduct in the present action constituted such a waiver. *See Umbach II*, 2015 WL 6125253, at *4. We agree.

This case has been pending since 2007 and has always included the claim that defendants' rejection of Umbach's withdrawal request breached the LPA. Although Umbach did not identify damages as a requested form of relief in either his original complaint or his First Amended Complaint filed in 2011, he did ask for "such other and further relief as this Court deems just and proper" (*e.g.*, First Amended Complaint, Prayer for Relief ¶ (D)); and defendants, among their affirmative defenses, asserted that Umbach had suffered no damages, and that if he had, he failed to

22

mitigate those damages (*see*, *e.g.*, Answer to First Amended Complaint ¶¶ 86, 87). Although defendants also pleaded the Agreement's arbitration provision as another affirmative defense (*see*, *e.g.*, *id*. ¶ 89), we see no indication in the record that they ever moved to compel arbitration.

Rather, defendants moved in 2012 for leave to amend their answer to Umbach's First Amended Complaint for the purpose of asserting several counterclaims seeking money damages against Umbach, including two alleging that Umbach had breached the Agreement (by, *inter alia*, bringing the present action). Their motion stated that the contract claims were "ones that Defendants originally intended to assert in a separate action following the conclusion of this one," but that one claim was "premised on" information defendants had learned in discovery in this action, and defendants felt it "desirable to assert the [contract] counterclaims now." (Defendants' Memorandum in Support of Motion for Leave To Amend Answer to First Amended Complaint at 4.) As the district court noted in *Umbach II*, defendants' proposed counterclaims would themselves have been subject to binding arbitration. The district court did not err in ruling that defendants, by their conduct, waived the right to demand arbitration.

Second, the rules of civil procedure provide that leave to amend a complaint should be given "when justice so requires." Fed. R. Civ. P. 15(a)(2). The grant or denial of leave to amend is reviewable only for abuse of discretion. *See*, *e.g.*, *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016).

Here, in response to the district court's instruction to the parties to submit briefing on the issues remaining after *Umbach I*, Umbach urged the court to grant him rescission or, in the alternative, damages. Defendants, in their post-*Umbach I* submissions--for which they twice requested and received extensions of time--made no request for an opportunity to conduct discovery

23

into Umbach's damages. Instead, both sides proceeded to brief the issue of contract damages. (*See*, *e.g.*, "Defendants' Supplemental Memorandum of Law Concerning [*inter alia*] *Contract Damages* . . . ." at 19-24 (emphasis added); Plaintiff's Supplemental Brief Regarding Damages at 1-11; *see also* Supplemental Declaration of Darren A. Fulco in Support of Defendants' Supplemental Submissions on Contract Damages [*inter alia*] dated June 2, 2014 ("Fulco Supp. Decl."), ¶ 5). In any event, given our remand for further proceedings on the issue of damages (*see* Part II.B. below), the district court may, in its discretion, determine whether to afford an opportunity for additional discovery as to damages if either side so requests.

As the district court had concluded as a matter of law that defendants breached the Agreement, it was well within the bounds of discretion to conclude that justice required that Umbach be given an opportunity to further amend his complaint to include an express request for damages.

B.  Damages

When the court determines that a contract has been breached, "the non-breaching party is entitled to recover damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made." *Paul*, 974 A.2d at 146 (internal quotation marks omitted). "Such damages should not act as a windfall" and "are measured by the losses caused and gains prevented by [the] breach." *Id*. at 146-47 (internal quotation marks omitted). The goal is to "place the injured party . . . in the same place as he would have been if the contract had been performed," *id*. at 146 (internal quotation marks omitted),  because

> the standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*. This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract. Expectation damages

24

thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost,

*Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) (footnote omitted); *see*, *e.g.*, *eCommerce Industries, Inc. v. MWA Intelligence, Inc.*, C.A. No. 7471-VCP, 2013 WL 5621678, at *43 (Del Ch. Sept. 30, 2013) ("*eCommerce*") ("In assessing damages for breach of contract and related claims, it is therefore important to consider how the positions of the parties would differ in the 'but-for' world-- *i.e.*, the hypothetical world that would exist if the Agreement had been fully performed."). "[W]hen a contract is breached, expectation damages can be established as long as the plaintiff can prove the *fact* of damages with reasonable certainty. The *amount* of damages can be an estimate." *Siga Technologies, Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015) (emphases in original).

We have two difficulties with the district court's ruling that Umbach was entitled as a matter of law to an award of $1,335,137.55 in damages. First, there is evidence in the record that the Fund made modest distributions to Umbach after 2007. If he had been allowed to withdraw as he requested, he would not have received those distributions. Accordingly, whatever amount Umbach is ultimately determined to have been able to receive if his withdrawal request had been honored should be subject to a reduction in the nature of a set-off for the amounts he thereafter did receive.

Second, the district court, in awarding Umbach $1,335,137.55 as his share of the Fund's September 28, 2007 NAV based on the monthly financial statement sent to him by CCM, viewed that statement as the only competent evidence as to the value of Umbach's interest in the Fund on his requested withdrawal date. *See Umbach II*, 2015 WL 6125253, at *5. The court's view that the Fund's net asset value as reported in the financial statements prepared by CCM was to reflect the assets' market value finds support in the Agreement itself, which (a) provided that the General Partner

25

periodically "will determine the Net Asset Value of the Partnership" (Agreement § 2.24); (b) defined "'Net Asset Value' [to] mean[,] at any date[,] the *market* value of the total assets of the Partnership less the market value of all liabilities of the Partnership" (*id*. (emphasis added)); and (c) provided that "[a]ll matters concerning the determination of Net Asset Value, . . . including . . . the allocation of profits, gains and losses among the Partners, . . . will be determined by the General Partner, *whose determination will be final and conclusive as to all the Partners*" (*id*. § 5.6 (emphasis added)). "Partners" is defined to include the "General Partner." (*Id*. § 2.27.)

The general withdrawal section required that, within 20 business days after the withdrawal date, the limited partner be paid 90 percent of the value of his interest in the Fund, with the remaining 10 percent withheld pending an audit. (*See* Agreement § 3.9.1.) However, while other provisions expressly referred to the Fund's "Net Asset Value" (*e.g.*, § 3.9.2 (dealing with limited partners who withdraw immediately after the loss of a "Key" manager)), the main provision setting forth the general withdrawal procedures did not use the term "Net Asset Value" (*see id*. § 3.9.1). We note that, irrespective of any withdrawl requests, audits were to take place following each withdrawal date (*see id*. § 7.2), and that the audit for the quarter ending in September 2007 found no issues (*see* Independent Auditors' Report as of September 30, 2007, dated January 29, 2008). According to the September 2007 report, the value of Umbach's interest was then $1,335,137.55.

The interaction among the various Agreement provisions is perhaps not as clear as it could be (though we express no view on whether the relevant provisions are ambiguous under Delaware's law of contract), and the district court did not expressly analyze these provisions in its damages analysis. Accordingly, we also remand for the district court to conduct that analysis in the first instance.

In the event that the district court's analysis does not lead it to the conclusion that the audited September 2007 report, prepared by CCM as General Manager is decisive, under Delaware law, as to the amount that should have been distributed to Umbach--especially in light of the provision that the General Partner's "determination of Net Asset Value" and the proper "allocation of profits, gains and losses among the Partners" was to be "final and conclusive as to all the Partners," including the "General Partner" (Agreement §§ 5.6, 2.27)--we note that defendants proffered evidence from which it could be inferred that the Fund's net asset value as reported in its financial statements was not in fact tied to current market value and thus did not reflect the amount that Umbach could actually receive as his interest in the Fund.

The Fulco Declaration stated that the Fund's "principal assets" consisted of its interest in another fund (called the "Master Fund") whose assets were principally subprime-mortgage-backed securities. (Fulco Decl. ¶ 8; *see also* Fulco Supp. Decl. ¶ 5 (stating that the Fund's interest in the Master Fund was its "sole" asset).). Fulco stated that most of those securities "were generally illiquid and, accordingly, were ordinarily valued on the basis of modeled future cash flows" (Fulco Decl. ¶ 8), and that the future-cash-flow valuation of the assets did not reflect their present market value (*see id*. ¶ 14 ("model valuation was based on the long-term value of the assets, with all the attendant market and other risks. Most of those assets had no market value in September 2007, as distressed prices were the only thing being offered in the totally dislocated market."); *see also* Fulco Supp. Decl. ¶ 5 (most of the securities "were illiquid, were not publicly traded, and no ordinary market prices existed therefor")). Thus, according to Fulco,

> [b]y early Summer 2007, most Master Fund portfolio assets could not be sold at any price, as the market for lower credit mortgage-backed securities had completely shut down. Moreover, the Master Fund had approximately $300 million in debt by August 2007. There was a substantial probability that a

27

liquidation of the entire portfolio would yield no proceeds after liabilities were satisfied. Accordingly, had CCM attempted to meet the third-quarter 2007 withdrawal requests in due course, the most likely outcome would have been the destruction of the entire value of remaining investors' interests in the Fund . . . and little or no payouts to withdrawing investors.

(Fulco Decl. ¶ 10.) Fulco stated that

CCM also understood . . . that as soon as one of the securities in its portfolio were to be sold, market standards and agreed-upon procedures with the Fund's auditors would have required that the remainder of the portfolio could no longer be valued on the prior modeled cash flow basis, but instead would have to be marked to the distressed price of the assets which were sold in the inactive and dislocated market, thereby reducing the NAV of all investors.

13. Under the LPA, withdrawing investors were entitled to an amount equal to their pro rata portion of the Fund's NAV calculated as of September 28, 2007. As described above, however, the very act of selling assets to meet withdrawal requests would have resulted in an immediate, dramatic reduction in portfolio valuation prior to September 28, 2007. Given the Master Fund's substantial debt, September 28, 2007 NAV likely would have been $0 or less.

(*Id*. ¶¶ 12-13.) Fulco also stated that "had the LPA Amendment failed to receive the requisite approval of at least two-thirds of the limited partners, CCM would have declared the termination of the Fund . . . prior to September 28, 2007." (Fulco Supp. Decl. ¶ 22.)

Many of Fulco's statements are not, of course, factual statements but rather are conclusory statements or predictions based on hypothetical scenarios that did not occur. Further, while Fulco estimated that in the summer of 2007 subprime-mortgage-backed "assets had no market value" (Fulco Decl. ¶ 14), that assertion was couched in terms of "most" of the assets (*id*.) being "generally" illiquid (*id*. ¶ 8) and was tacitly tempered by references to their "likely" values (*id*. ¶ 13). And although Fulco stated that in the summer of 2007 "the market for lower credit mortgage-backed securities had completely shut down" (*id*. ¶ 10), that categorical statement was contrary to his statements that "distressed prices were . . . being offered" (*id*. ¶ 14) and that CCM--if it had exercised

28

the § 3.9.1 "Hardships" option--would have been required to sell assets by accepting the first price offered (*see* Fulco Decl. ¶ 19; Fulco Supp. Decl. ¶ 19). Even when prices are depressed, prices offered indicate market value.

Defendants' proffered evidence plainly was not sufficient to establish as a matter of law that Umbach's interest in the Fund, if his withdrawal request had been honored, would have had no value. However, if factual questions persist despite the terms of the Agreement, the competing assertions of Umbach and defendants must, under Delaware law, be assessed in accordance with "the 'but-for' world--*i.e.*, the hypothetical world that would exist if the Agreement had been fully performed," *eCommerce*, 2013 WL 5621678, at *43, and in the context of the 2007-2008 financial crisis associated with subprime-mortgage-backed securities. That crisis has been well-chronicled. *See*, *e.g.*, *In re Lehman Brothers Mortgage-Backed Securities Litigation*, 650 F.3d 167, 173 n.2 (2d Cir. 2011) ("Subprime mortgages are loans made to borrowers with poor credit histories, creating a high risk of default." (internal quotation marks omitted)); *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 245 (6th Cir. 2012) ("The value of mortgage-backed securities plummeted and helped fuel a nationwide economic crisis in 2007 and 2008."); *In re Citigroup Erisa Litigation*, 662 F.3d 128, 146 n.1 (2d Cir. 2011) (Straub, *J.*, concurring in part and dissenting in part) ("To oversimplify, the subprime crisis may be summarized as follows. Beginning in approximately 2001, many mortgage lenders approved loans for borrowers who did not qualify for prime interest rates . . . . Financial institutions packaged these mortgages into mortgage-backed securities, which were then sold to investors. By 2006, home prices began to drop while interest rates rose. As a result, many borrowers could neither pay their existing mortgages nor refinance at favorable rates. Delinquencies

and foreclosures thus increased, and the value of mortgage-backed securities dropped precipitously. Banks and other investors that were overly exposed to such investments faced the threat of collapse.")

We note finally that, despite the financial crisis and the Fulco assertions, defendants were hardly consistent as to the valuation they attributed to the Fund. While Fulco posited that the assets had not value, defendants' 2012 motion to amend their answer proposed to assert a counterclaim alleging that in an "asset liquidation, CCM believed" the Fund's assets could be sold for as much as "40 percent of their fair market value." (Carrington's proposed Counterclaims ¶ 30.) And notwithstanding defendants' protestations as to the Fund's worth and viability, the Fund fared sufficiently well that, according to partnership Schedules K-1, CCM's annual management fees in 2007-2010, at 1.5% of the Fund's reported net asset value, totaled more than $57 million.

CONCLUSION

We have considered all of the parties' arguments on this appeal and, except to the extent indicated above, have found them to be without merit. The judgment of the district court is vacated, and the matter is remanded for further proceedings with respect to damages.